*This opinion is subject to revision before final publication in the Pacific Reporter*

**2020 UT 9**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Respondent,*

*v.*

MEAGAN GRUNWALD,
*Petitioner.*

No. 20180459
Heard March 18, 2019
Filed February 21, 2020

On Certiorari to the Utah Court of Appeals

Fourth District, Provo
The Honorable Darold McDade
No. 141400517

Attorneys:

Sean D. Reyes, Att'y Gen., Christopher D. Ballard, Asst. Sol. Gen., Salt Lake City, Timothy L. Taylor, AnnMarie T. Howard, Provo, for respondent

Douglas J. Thompson, Provo, for petitioner

CHIEF JUSTICE DURRANT authored the opinion of the Court, in which JUSTICE HIMONAS, JUSTICE PEARCE, and JUDGE THOMAS* joined.

ASSOCIATE CHIEF JUSTICE LEE filed a dissenting opinion.

Having recused herself, JUSTICE PETERSEN does not participate herein; DISTRICT COURT JUDGE DOUGLAS THOMAS sat.

_____

\* Judge Thomas sat on this case and voted before his retirement on January 1, 2020.

CHIEF JUSTICE DURRANT, opinion of the Court:

**Introduction**

¶1    Meagan Grunwald was convicted as an accomplice to the crime of aggravated murder. But the jury instruction that provided the basis for her conviction contained three errors: (1) it impermissibly permitted conviction based on a finding of recklessness, a less culpable mental state than is required by statute, (2) it impermissibly permitted conviction based on intentional aid that was not directly connected to the murder, and (3) it impermissibly permitted conviction based on a finding that Ms. Grunwald knew that the *principal actor's* conduct was reasonably certain to result in aggravated murder, rather than on the finding that she knowingly committed the *actus reus* to help the principal actor in committing the murder. We must determine whether any of these errors, or a combination of them, caused a reasonable probability of an unfair conviction. In other words, we must determine whether, in the absence of these errors, there is a reasonable probability the jury would have arrived at a different result.

¶2    The court of appeals considered this question and determined there was no such probability. Accordingly, that court affirmed Ms. Grunwald's conviction. Now Ms. Grunwald asks us to reverse the decision of the court of appeals because, in her view, the court failed to properly consider all of the evidence presented to the jury and misconstrued some of the legal requirements of accomplice liability. Because it is reasonably probable that the jury would not have convicted Ms. Grunwald of aggravated murder absent the jury instruction errors, we reverse her conviction and remand for a new trial with correct jury instructions.

**Background**

¶3    Jose Angel Garcia Juaregi (Mr. Garcia) shot and killed a police officer through the back window of his girlfriend's pickup truck. Some of the facts surrounding this murder are undisputed, while others are hotly contested and underlie the key issue on appeal.

¶4    It is undisputed that at the time of the murder Mr. Garcia and his girlfriend, Meagan Grunwald, were parked on the side of a road with their hazard lights flashing, and that Sergeant Cory Wride, the victim-police officer, had pulled up behind them to perform a "motorist assist." During the motorist assist, Sergeant Wride first approached the driver-side door to speak to Ms. Grunwald, who was

driving, and asked her if she was okay. Although she was crying and her face was red, she told Sergeant Wride that she was fine. Sergeant Wride then returned to his car to verify Ms. Grunwald's and Mr. Garcia's identities through a search of a police database. But Mr. Garcia had provided a false name and birthdate because a warrant had been issued for his arrest, so Sergeant Wride's search did not yield any results.

¶5 Video footage from Sergeant Wride's dashboard camera reveals what happened next. About ten minutes into the motorist assist, Sergeant Wride exited his car and approached the passenger-side window to speak to Mr. Garcia. At the window, Sergeant Wride asked Mr. Garcia if he had provided a false name, and Mr. Garcia admitted that he had. Mr. Garcia then provided another false name, and Sergeant Wride returned to his car to run the second false name through the police database.

¶6 Although the heavy tint on the truck's back window prevented the dashboard camera from recording what was taking place inside the truck, footage does show that about a minute after Sergeant Wride returned to his vehicle, the truck's brake lights flashed on and the lower-rear lights flickered, indicating a gear shift. One minute and a half later, the rear-passenger side window popped open about an inch. Just over one minute after that, the truck lurched forward slightly. And roughly one minute later, the truck's center, rear window slid open and Mr. Garcia fired seven shots at Sergeant Wride in quick succession. After the fifth shot, Ms. Grunwald began pulling onto the road. Mr. Garcia fired the final two shots as she drove away. The entire event—from the time Sergeant Wride spotted Ms. Grunwald's truck parked on the side of the road to the moment the truck drove away after the shooting—took roughly eighteen minutes, the last four of which involved Ms. Grunwald holding her foot on the brake and driving away after the shots had been fired.

¶7 After an extended police chase, Mr. Garcia was shot and killed, and Ms. Grunwald was arrested. Ms. Grunwald was charged as an accomplice in Sergeant Wride's murder, as well as in a number of other crimes that are not at issue in this appeal. A trial followed.

¶8 At trial, the jury was shown the dash-cam footage multiple times. Both parties agree the dash-cam footage accurately depicts the crime in this case. But as to the details of what was taking place inside the truck immediately before Mr. Garcia began shooting, the jury heard two very different stories.

¶9 Ms. Grunwald raised "compulsion" as an affirmative defense at trial. Under the doctrine of compulsion, people are not

guilty of a crime if they were coerced, through threat or force, to commit the crime. In support of her compulsion defense, Ms. Grunwald's attorney painted Mr. Garcia as "the ultimate predator and exploiter" and a "master manipulator" and Ms. Grunwald as a scared, impressionable young girl who became increasingly intimidated by Mr. Garcia's growing anger and agitation. According to Ms. Grunwald, while Sergeant Wride was searching Mr. Garcia's false name, Mr. Garcia put a gun to her head and threatened her and her family. He then demanded that she put her foot on the brake, and, after she complied with this demand, he shifted the truck into drive. Finally, Ms. Grunwald testified that she began driving only after Mr. Garcia yelled "go, go, go" at her. So, based on this version of the story, Ms. Grunwald argues that anything she may have done to assist Mr. Garcia in murdering Sergeant Wride was coerced.

¶10   But even though Ms. Grunwald argued she was coerced into acting, she never admitted she intended for Mr. Garcia to kill Sergeant Wride, nor that she knew he would do so. Instead, she testified she did not know Mr. Garcia intended to kill Sergeant Wride, and that, even after Mr. Garcia had shot his gun, she assumed he had merely attempted to disable the police car. Ms. Grunwald did admit, however, that she twice heard Mr. Garcia say that he was going to "buck [Sergeant Wride] in the fucking head." But she testified that she did not know what this statement meant and that Mr. Garcia refused to clarify his meaning when she asked him to do so.[1] So even though Ms. Grunwald admits she held her foot on the brake for approximately four and a half minutes before Mr. Garcia began shooting, and that at some point during that time Mr. Garcia stated he was going to "buck" Sergeant Wride in the head, she claims she did not intend for Mr. Garcia to kill him or know that he would do so.

---

[1] At trial, Ms. Grunwald's testimony regarding the timing of this statement was inconsistent. On direct-examination, she narrated the events taking place inside the truck while the dash-cam video played. During this testimony she indicated that she had placed her foot on the brake pedal approximately three minutes and forty seconds before Mr. Garcia allegedly made the statement at issue (and four and a half minutes before he began firing). But on cross-examination, she indicated that Mr. Garcia had made the statement before she placed her foot on the brake.

¶11 The State, on the other hand, described Ms. Grunwald as a desperate lover who would not allow anything "to get in her way or come between her and her man." According to the State, upon learning that Mr. Garcia had a "Board of Pardons warrant out," Ms. Grunwald felt "her world crumbling down" because she could no longer be with Mr. Garcia if he were arrested. For this reason, the State argued, she viewed Sergeant Wride as "a threat to her[self] and her future." The State argued that, because of this fear, Ms. Grunwald and Mr. Garcia formed a plan, and that consistent with that plan, Ms. Grunwald intentionally aided in Sergeant Wride's murder. According to the State, she did this by placing her foot on the brake, shifting into gear, waiting with her foot on the brake in preparation for their escape, and acting as a lookout so that Mr. Garcia could open fire when no other cars were driving by.

¶12 After both sides presented their versions of the story at trial, the jury returned a guilty verdict. Ms. Grunwald appealed to the court of appeals. On appeal, she argued that her trial counsel was ineffective for failing to object to three errors in the jury instruction regarding accomplice liability. The court of appeals agreed that the jury instructions erroneously (1) included "recklessness" as a mental state upon which criminal liability could be found;[2] (2) allowed the jury to convict Ms. Grunwald based on intentional aid that was not directly connected to the murder;[3] and (3) allowed the jury to convict Ms. Grunwald based on knowledge that Mr. Garcia's actions were reasonably certain to result in the aggravated murder, rather than on knowledge that her own actions were reasonably certain to do so.[4] The court of appeals also concluded that the performance of Ms. Grunwald's trial counsel was deficient because he did not object to these errors in the jury instructions.

¶13 But the court of appeals determined that those errors were not prejudicial, because the evidence demonstrated that Ms. Grunwald intentionally aided Mr. Garcia to commit those crimes and, because the jury rejected her "compulsion" theory, there was not a reasonable probability of a more favorable outcome absent the errors.

---

[2] *State v. Grunwald*, 2018 UT App 46, ¶ 33, 424 P.3d 990.

[3] *Id.* ¶ 39.

[4] *Id.* ¶ 41.

¶14 Ms. Grunwald requested certiorari review of this determination, which we granted. We have jurisdiction pursuant to Utah Code section 78A-3-102(3)(a).

## Standard of Review

¶15 We granted certiorari to review whether the court of appeals erred in concluding that Ms. Grunwald's trial counsel's deficient performance did not result in prejudice. On certiorari, "we review the court of appeals' decision for correctness."[5]

## Analysis

¶16 Ms. Grunwald argues her aggravated murder conviction should be overturned because her trial counsel was ineffective for failing to object to multiple errors in the relevant jury instruction. The jury instruction required the jury to find Ms. Grunwald guilty as an accomplice to aggravated murder if it found that (1) she "'[i]ntentionally,' 'knowingly,' or 'recklessly' solicited, requested, commanded, encouraged, or 'intentionally' aided" Mr. Garcia *who* committed aggravated murder and (2) she "[i]ntended that [Mr. Garcia] commit the crime of Aggravated Murder, or [w]as aware that [Mr. Garcia's] conduct was reasonably certain to result in [Mr. Garcia] committing the crime of Aggravated Murder, or [r]ecognized that her conduct could result in [Mr. Garcia] committing the crime of Aggravated Murder but chose to act anyway." The court of appeals identified three distinct errors in this jury instruction. First, the court explained that the instruction erroneously "permits a conviction based on a reckless mental state."[6] Second, it explained that the instruction erroneously permits conviction based on intentional aid that was not directly connected to the murder.[7] And third, it explained that the instruction erroneously permits conviction based on knowledge that Mr. Garcia's actions were reasonably certain to cause the aggravated murder, rather than on knowledge that Ms. Grunwald's own actions were reasonably certain to do so.[8]

---

[5] *State v. Martinez-Castellanos*, 2018 UT 46, ¶ 32, 428 P.3d 1038 (citation omitted).

[6] *State v. Grunwald*, 2018 UT App 46, ¶ 33, 424 P.3d 990.

[7] *Id.* ¶ 37.

[8] *Id.* ¶ 40.

¶17 The court of appeals also concluded that the performance of Ms. Grunwald's trial counsel had been deficient because he failed to object to these errors.[9] But the court nevertheless affirmed her aggravated murder conviction because it concluded that the jury instruction errors did not prejudice Ms. Grunwald.[10] Ms. Grunwald asks us to review this decision.

¶18 Ms. Grunwald argues that the court of appeals erred in concluding the jury instruction errors did not result in prejudice because it failed to consider the totality of the evidence, and it misstated, or misconstrued, much of the evidence it did consider. We agree.

¶19 Under the standard the United States Supreme Court established in *Strickland v. Washington*, a court may disturb a criminal conviction based on an allegation of ineffective assistance of counsel only where the criminal defendant shows (1) "that counsel's performance was deficient," and (2) that "the deficient performance prejudiced the [criminal defendant's] defense."[11] The first prong of this analysis requires the defendant to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."[12] And the second prong requires the defendant to show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."[13] The court of appeals applied this two-pronged analysis to the facts of this case.

¶20 Although, under the first prong, the court determined that Ms. Grunwald's trial counsel's failure to object to the erroneous jury instructions constituted deficient performance,[14] it concluded, under

---

[9] *Id.* ¶ 42.

[10] *Id.* ¶ 49.

[11] 466 U.S. 668, 687 (1984).

[12] *Id.*

[13] *Id.*

[14] The court of appeals determined that the performance of Ms. Grunwald's trial counsel was "deficient because [he] failed to object to serious errors in the jury instructions relating to accomplice liability." *Grunwald*, 2018 UT App 46, ¶ 24. This determination was not appealed.

the second prong, that these errors did not prejudice Ms. Grunwald.[15] But after reviewing the evidence on record, we conclude otherwise.

¶21 Under *Strickland*'s prejudice prong, we must determine whether "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."[16] So this case requires us to determine whether Ms. Grunwald's trial counsel's failure to object to the erroneous jury instructions deprived her of a fair trial the result of which is reliable. In the past we have suggested that we may presume prejudice where there were errors in a jury instruction related to an essential element of a crime.[17] But in our recent *State v. Garcia* decision, we clarified that, where an error in a jury instruction is alleged, we must conduct the full analysis required under *Strickland*'s prejudice prong.[18]

¶22 When applying *Strickland*'s prejudice analysis in the context of erroneous jury instructions, we must determine whether there is a reasonable probability the jury would not have convicted the defendant if the jury instructions had been correct. A reasonable probability "is a probability sufficient to undermine [our] confidence in the outcome."[19] To determine whether there is a reasonable probability of a different outcome, we must ask ourselves two questions: (1) did the error in the jury instructions create the possibility that the jury convicted the defendant based on factual findings that would not have led to conviction had the instructions been correct? and, (2) if so, is there a *reasonable probability* that the jury based its verdict on those factual findings? We followed this two-part analysis in *Garcia*.[20]

---

[15] *Id.* ¶ 49.

[16] *Strickland*, 466 U.S. at 687.

[17] *See State v. Laine*, 618 P.2d 33, 35 (Utah 1980) ("In our view, the failure to include the intent element in the basic 'elements' instruction is reversible error.").

[18] 2017 UT 53, ¶ 41, 424 P.3d 171 (criticizing the court of appeals for failing to "fully conduct[] the prejudice inquiry *Strickland* requires" in a case involving erroneous jury instructions).

[19] *Id.* ¶ 42 (citation omitted).

[20] *Id.* ¶ 41. Associate Chief Justice Lee argues that this two-step analysis reformulates the *Strickland* prejudice prong. *See infra* ¶¶ 85,

(Continued)

¶23 In *Garcia*, we considered whether an error in an instruction relating to the defendant's affirmative defense had resulted in prejudice. In so doing, we suggested that courts should begin by analyzing "how [the erroneous] instruction might have impacted [the defendant's] trial" and by "predict[ing] juror behavior in response to the erroneous instruction."[21] In other words, this step requires courts to compile a list of the theoretical factual scenarios in which the incorrect instruction permitted the jury to impermissibly convict the defendant.

¶24 For example, in *Garcia*, the jury instruction at issue failed to clearly convey the significance of a finding of imperfect self-defense. In that case, a correct jury instruction "would have informed the jury that if [the defendant] acted in imperfect self-defense," the defendant could be convicted only of attempted manslaughter, not attempted murder.[22] Because the jury instructions failed to inform the jury of the consequence of an imperfect self-defense finding, they created the possibility that the jury convicted the defendant of attempted murder even if the jury concluded that the defense of imperfect self-defense applied. So, in *Garcia*, there was a theoretical factual scenario—a scenario upon which the jury found that the defendant

---

102–04 (Lee, A.C.J., dissenting). In his view, our analysis "asks only whether there is a reasonable probability that the jury *in fact* based its decision on an error in the jury instructions," not whether "the jury would have come down the other way in the absence of such an error." *See infra* ¶ 104 (Lee, A.C.J., dissenting) (emphasis in original). But Justice Lee overlooks a key part of our two-step analysis. Part one of our analysis requires us to determine whether the jury could have based a conviction on a factual scenario that *would not have led to conviction had the instructions been correct*. Part two then requires us to determine whether there is a reasonable probability that the jury based its guilty verdict on those factual findings. By identifying whether there is a reasonable probability the jury based its decision on factual findings that would not have supported a guilty verdict had the jury instructions been correct, these steps require us to determine whether there is "a reasonable probability that the jury would have reached a different verdict under a correct instruction." *See infra* ¶ 104 (Lee, A.C.J., dissenting). So our analysis requires what Justice Lee argues it must under *Strickland*'s prejudice prong.

[21] 2017 UT 53, ¶ 41.

[22] *Id.* ¶ 23 n.5.

acted in self-defense—in which the incorrect instructions may have permitted the jury to erroneously convict the defendant.

¶25 Thus the first step of our prejudice analysis, in the context of jury instruction errors, is to identify the theoretical factual scenarios in which the error in the jury instructions permitted the jury to wrongfully convict the defendant.[23] In this case, the court of appeals concluded that three errors in "the jury instructions improperly allowed the jury to convict [Ms.] Grunwald as an accomplice under three impermissible scenarios: (1) if she acted recklessly as to the results of her conduct, rather than intentionally or knowingly; (2) if she directed her actions to some purpose other than the commission of the principal crime; or (3) if she acted knowing that [Mr.] Garcia's actions, rather than her own, were reasonably certain to result in the commission of the principal crime."[24] We largely agree with this analysis.

¶26 The court of appeals correctly applied the first step of the *Garcia* analysis, but it erred in applying *Garcia*'s second step. In *Garcia*, we explained that, in addition to identifying theoretical factual scenarios in which the error in the jury instructions permitted the jury to wrongfully convict the defendant, a "proper analysis also needs to focus on the evidence before the jury and whether the jury could reasonably have [made factual findings] such that a failure to instruct the jury properly undermines confidence in the verdict."[25] In other words, after we have identified the factual scenarios that theoretically could have formed the basis of a wrongful conviction,

---

[23] Justice Lee criticizes this step in his dissent. *See infra* ¶ 103 n.91 (Lee, A.C.J., dissenting) (explaining that we need not "compile a list of the theoretical factual scenarios in which the incorrect instruction permitted the jury to impermissibly convict the defendant"). But Justice Lee does not explain how an appellate court could conduct a thorough prejudice analysis regarding a jury instruction error without first identifying the potential ways in which that error could have impacted the jury. As a practical matter, an appellate court will be unable to determine whether there is a reasonable probability that a jury would have reached a different result absent a jury instruction error without first identifying the possible ways that error could have affected the jury.

[24] *Grunwald*, 2018 UT App 46, ¶ 42.

[25] 2017 UT 53, ¶ 42.

we must determine whether there is a reasonable probability that, based on the totality of the evidence, the jury convicted the defendant based on one of those impermissible scenarios. If we conclude there is a reasonable probability the jury convicted the defendant based on one of the identified, impermissible factual scenarios, we may confidently hold that there is a reasonable probability the jury would not have reached a guilty verdict but for the errors in the jury instructions.

¶27 Although the court of appeals correctly identified three scenarios in which the jury instruction errors permitted the jury to wrongfully convict Ms. Grunwald of aggravated murder, it ultimately concluded there was not a reasonable probability that the jury convicted Ms. Grunwald based on any of them. We disagree. After considering the totality of the evidence, we conclude there is a reasonable probability the jury based its conviction on one of the impermissible scenarios rather than on a permissible one.

¶28 In so concluding, we note that the lack of any direct evidence contradicting Ms. Grunwald's testimony is a significant factor in our decision. The events underlying the alleged crime in this case occurred inside Ms. Grunwald's truck. And the only evidence directly informing us regarding those events comes from Ms. Grunwald's testimony. Although we also have video evidence depicting the outside of the truck during the event, the heavy tint on the truck's windows severely limits the information that video evidence provides. The video evidence indicates that Ms. Grunwald held her foot on the brake for a number of minutes, that, at one point, someone shifted the truck into drive, and it shows that the truck lurched forward slightly—suggesting that someone was moving around inside—shortly before the back window slid open and Mr. Garcia opened fire. This information is entirely consistent with Ms. Grunwald's testimony on direct-examination, where she carefully narrated what was occurring inside the truck as the jury watched the video. After considering this evidence, together with the other circumstantial evidence, we conclude there is a reasonable probability that, absent the jury instruction errors, the jury would have found Ms. Grunwald not guilty as an accomplice to the murder.

¶29 But this conclusion should not be misinterpreted as a finding that Ms. Grunwald is, in fact, not guilty. We are fully aware that the video evidence could also be interpreted consistent with the version of events hypothesized by the State. And we are mindful that a reasonable jury may find portions, or even all, of

Ms. Grunwald's testimony to lack credibility, particularly when considered in context of other, circumstantial evidence. But, contrary to what Associate Chief Justice Lee argues in his dissent, this other evidence does not eliminate the reasonable probability that a jury could find Ms. Grunwald not guilty.

¶30 In his dissent, Justice Lee disregards the only direct evidence we have of what occurred inside Ms. Grunwald's truck. And his ultimate conclusion appears to rest on a number of assumptions he makes regarding what Ms. Grunwald was thinking at the time of the murder[26] and the effect certain evidence, particularly Ms. Grunwald's testimony, would have on a jury.[27] But, as an appellate court, we are not well-positioned to make the type of unequivocal credibility determinations upon which Justice Lee's conclusion rests.[28] Although a jury could possibly react to the

---

[26] *See infra* ¶ 79 (Lee, A.C.J., dissenting) (stating that Ms. Grunwald acted "to allow [Mr. Garcia] to shift the truck into drive and aim a gun through the rear window"); *infra* ¶ 84 (Lee, A.C.J., dissenting) (stating that Ms. Grunwald "was at least a knowing collaborator in her boyfriend's acts of murder").

[27] *See infra* ¶ 96 (Lee, A.C.J., dissenting) (assuming the jury would find a portion of Ms. Grunwald's testimony "utterly lacking in credibility" and so would have been "likely to disregard all her other claims of misunderstanding"); *infra* ¶ 113 (Lee, A.C.J., dissenting) (assuming the jury "would have discounted anything else she said to try to exonerate herself"); *infra* ¶ 115 (Lee, A.C.J., dissenting) (assuming the jury would find that fifty seconds was more than enough time to fully process Mr. Garcia's "buck in the head" statement and that Ms. Grunwald's continued act of holding her foot on the brake meant that she intended to help, or knew it would help, Mr. Garcia commit murder).

[28] *See State ex rel. Z.D.*, 2006 UT 54, ¶ 24, 147 P.3d 401 ("Appellate courts are removed temporally and geographically from trial courts. They do not see juries impaneled or oaths administered to witnesses. They do not view first-hand witnesses' 'tells' of posture, inflection, or mood that strengthen or erode credibility. It is the lot of appellate judges to take their sustenance from the printed page; to peer into the facts as deeply as the flat plane of paper will permit. By the time the trial transcript reaches the hands of the appellate judge, the universal adjective describing its condition is 'cold.'").

evidence in the way Justice Lee assumes it would, we conclude, after considering the totality of the evidence, that there is a reasonable probability it could react differently.[29] For this reason, the three errors in the jury instruction have undermined our confidence in the guilty verdict.[30] We consider each jury instruction error, and its effect on the verdict, separately.[31]

## I. There is a Reasonable Probability the Jury Found That Ms. Grunwald Was Reckless as to the Results of Her Conduct, While Also Finding That She Did Not Intend for Sergeant Wride to Be Killed or Know That His Death Was Reasonably Certain to Result

¶31 The first error in the jury instruction is that it permitted the jury to convict Ms. Grunwald based on a finding that she acted recklessly, rather than intentionally or knowingly. This constitutes a serious error.

¶32 In *State v. Briggs*, we held that "[t]o show that a defendant is guilty under accomplice liability, the State must show that an individual acted with both the [requisite mental state] that the underlying offense be committed and the [requisite mental state] to aid the principal actor in the offense."[32] Accordingly, "the first step

---

[29] In rejecting the assumptions Justice Lee has made in this case as overly speculative, we are not suggesting that appellate courts should not consider circumstantial evidence in making prejudice determinations. *See infra* ¶¶ 97–98 (Lee, A.C.J., dissenting). Nor are we suggesting that appellate courts can never make credibility assessments, or that they must accept the entirety of a defendant's testimony. *See infra* ¶ 98 & n.89 (Lee, A.C.J., dissenting). Instead, we have merely concluded that, based on a totality of the direct and circumstantial evidence on the record *in this case*, Justice Lee's conclusions regarding Ms. Grunwald's credibility are too speculative. And, as a result, we conclude that his complete disregard of her direct testimony is unwarranted.

[30] *See Garcia*, 2017 UT 53, ¶ 41.

[31] Although, as an organizational matter, we consider each jury instruction error separately, our ultimate aim is to determine whether the jury instruction, as a whole, incorrectly instructed the jury and, in that way, prejudiced Ms. Grunwald.

[32] 2008 UT 75, ¶ 13, 197 P.3d 628. In *Briggs*, we actually held that the State must show that the defendant acted with both the *intent*

(Continued)

in applying accomplice liability is to determine whether the individual charged as an accomplice had the [requisite mental state] that an underlying offense be committed."[33]

¶33 The requisite mental state for an aggravated murder conviction is "knowing" or "intentional."[34] A person acts intentionally with respect to the result of his or her conduct when it is his or her "conscious objective or desire to . . . cause the result."[35] And a person acts knowingly when he or she is aware that his or her conduct is "reasonably certain to cause the result."[36] So the jury should have been permitted to convict Ms. Grunwald only if it found that she aided Mr. Garcia desiring to cause Sergeant Wride's death or she aided Mr. Garcia knowing that her conduct would most likely help him to cause Sergeant Wride's death.

¶34 Although the jury instruction included an instruction regarding intentional and knowing mental states, it also permitted the jury to convict Ms. Grunwald based on a reckless mental state. It stated that the jury could convict if it found that Ms. Grunwald "recognized that her conduct could result in [Mr. Garcia] committing the crime of Aggravated Murder but chose to act anyway." The inclusion of the reckless mental state instruction permitted the jury to convict Ms. Grunwald if it found that she was aware that her interactions with Mr. Garcia could possibly assist Mr. Garcia in murdering Sergeant Wride. So even if the jury had found that Ms. Grunwald did not intend for Mr. Garcia to kill Sergeant Wride, or know that her interactions with Mr. Garcia would most likely lead to Sergeant Wride's death, the jury was nevertheless permitted to convict her. This was error.

---

that the underlying offense be committed and the *intent* to aid the principal actor in the offense. *Id.* But it is clear from subsequent sentences that we used the term "intent" as a synonym for "criminal intent" or "the mental state required." *Id.; see also State v. Jeffs,* 2010 UT 49, ¶ 43, 243 P.3d 1250 (explaining that when we used the term "intent" in *Briggs*, we did so as "a legal term of art that means '[t]he state of mind accompanying an act.'" (*quoting Intent*, BLACK'S LAW DICTIONARY 881 (9th ed. 2009) (alteration in original)).

[33] *Briggs*, 2008 UT 75, ¶ 14.

[34] UTAH CODE § 76-5-202(1).

[35] *Id.* § 76-2-103.

[36] *Id.*

¶35 Although the court of appeals recognized that this error permitted the jury to wrongfully convict Ms. Grunwald based on a factual scenario in which Ms. Grunwald was merely reckless, it nevertheless concluded that the error did not prejudice Ms. Grunwald, because there was "no reasonable probability that the jury based its verdict on a finding that [Ms.] Grunwald was merely reckless as to the results of her conduct."[37] In support of this conclusion, the court explained that "[i]t was undisputed that [Mr.] Garcia was holding a gun and looking back at Sergeant Wride's patrol car when [Mr.] Garcia stated that he was 'going to buck [the officer] in the fucking head.'"[38] It then explained that "no reasonable person could have misinterpreted [Mr.] Garcia's objective under the circumstances."[39] This conclusion is flawed for two reasons.

¶36 First, the court erred in framing the question of Ms. Grunwald's mental state in objective terms even though the mental state element necessarily requires the jury to determine Ms. Grunwald's subjective mental state.[40] The court concluded that "no reasonable person could have misinterpreted [Mr.] Garcia's objective" when he said he was going to "buck" Sergeant Wride.[41] By basing its conclusion on what a reasonable person would have understood by this statement, the court of appeals, in effect, asked whether a reasonable *juror* could have misunderstood Mr. Garcia's intention under the circumstances. This was error. When determining the mental state of a criminal defendant, we cannot simply impute the mental state of a "reasonable person" to the defendant. Instead, we must determine the defendant's actual mental state. So the court of appeals should have asked whether a reasonable jury could have concluded that Ms. Grunwald did not understand Mr. Garcia's intention. And when the question is

---

[37] *State v. Grunwald*, 2018 UT App 46, ¶ 50, 424 P.3d 990.

[38] *Id.* (fourth alteration in original).

[39] *Id.*

[40] *Mens Rea*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "mens rea" as the "state of mind that the prosecution, to secure a conviction, must prove that a defendant had when committing a crime").

[41] *Grunwald*, 2018 UT App 46, ¶ 50.

reframed in this way, and the totality of the evidence is considered, there is a reasonable probability the jury may have concluded that Ms. Grunwald did not understand Mr. Garcia's intentions even though a reasonable person would have.

¶37 In this case, the only direct evidence regarding what Ms. Grunwald understood of Mr. Garcia's intention comes from Ms. Grunwald's testimony. She testified at two separate times that she did not understand what Mr. Garcia meant when he said "I'm going to buck him." She also explained that, in response to this statement, she asked Mr. Garcia what he meant, but that Mr. Garcia ignored her question and began firing without warning soon after. And she testified that even after Mr. Garcia had shot his gun, she assumed he had merely attempted to disable the police car.[42] So, by framing the question of whether Ms. Grunwald understood the meaning of the term "buck" in objective terms, the court of appeals necessarily disregarded Ms. Grunwald's testimony to the contrary.

¶38 The court of appeals may have disregarded Ms. Grunwald's testimony regarding her subjective understanding because it assumed the jury did not believe her when she said she did not know what the term "buck" meant. In other words, when the court stated that "no reasonable" person would have misunderstood the meaning of the term under the circumstances, it may have been suggesting that the jury would not have believed Ms. Grunwald's

---

[42] We also note that a key difference between a knowing and a reckless mental state is that, unlike with a reckless mental state, a knowing mental state requires a defendant to be aware not just that the relevant conduct *could* result in the crime, but that it is *reasonably certain* to result in the crime. This difference increases the likelihood that the jury convicted Ms. Grunwald on the recklessness standard. Based on the distance between the truck and Sergeant Wride's vehicle, it may not have been reasonably certain that the murder would occur. A deadly outcome would have been more certain, for example, if Sergeant Wride had been approaching the vehicle when Mr. Garcia fired his weapon. Additionally, the jury might have accepted Ms. Grunwald's testimony that she believed that the windshield on Sergeant Wride's vehicle was bulletproof. If that was the case, it is more unlikely that the jury found that Ms. Grunwald was aware that the murder was reasonably certain to occur, rendering more probable the likelihood that it based its conviction on a finding of recklessness.

testimony, because Ms. Grunwald's alleged failure to understand the term's meaning would be less than reasonable. But this reasoning ignores the possibility that the jury could have concluded that Ms. Grunwald's level of comprehension fell below what a "reasonable person" would have understood under the circumstances.[43] And when a totality of the evidence is considered, it is reasonably probable that the jury would have reached this conclusion.

¶39 There is a reasonable probability that the jury would have considered Ms. Grunwald's ability to comprehend the meaning of Mr. Garcia's "buck" comment to be below that of a "reasonable person." At the time of the crime, Ms. Grunwald was only seventeen years old.[44] There is also evidence that Ms. Grunwald suffers from a learning disability that may have lessened her ability to understand the significance of Mr. Garcia's words.[45] And her trial counsel

---

[43] Justice Lee concedes that it is "theoretically possible" that the jury could have found that Ms. Grunwald's understanding fell below that of a reasonable person, *infra* ¶ 107 (Lee, A.C.J., dissenting), but he rejects that possibility in this case because, in his view, the alleged misunderstanding would be "ridiculous." *Infra* ¶ 112 (Lee, A.C.J., dissenting). This is so, he explains, even if we take Ms. Grunwald's age, learning disability, easily-intimidated nature, and the stress of the moment into account. *Infra* ¶ 112 (Lee, A.C.J., dissenting). But in so arguing, Justice Lee makes the same mistake as the court of appeals—he excludes the possibility that the jury could have found Ms. Grunwald capable of reaching an unreasonable (or even a "ridiculous") conclusion.

[44] Justice Lee suggests that we should not consider her age because she was tried as an adult. *Infra* ¶ 109 (Lee, A.C.J., dissenting). But we do not see how the district court's determination that Ms. Grunwald should be tried as an adult would prevent the jury from considering her age in assessing her credibility or her comprehension level.

[45] At trial, Ms. Grunwald stated the following regarding her learning disability: "I had to take special classes, which are basically resource classes because I have a hard time reading and writing and I have a really hard time of like when I read stuff of comprehending it and knowing what it says." And she stated that this disability required her to work harder than "regular students": "if we had a book project I had to spend like almost three times the time that a

(Continued)

argued that Ms. Grunwald is easily intimidated and was under a lot of stress at the time, which likely further limited her ability to understand the meaning of Mr. Garcia's words.

¶40 Based on this evidence, a jury could reasonably conclude that in these fraught and volatile circumstances a seventeen-year-old girl would be unable to quickly process and understand Mr. Garcia's intentions when he used the term "buck." And it is likely a jury would find that Ms. Grunwald mentally froze in this way when it considers this evidence together with Ms. Grunwald's cross-examination testimony. On cross-examination, she defended her sworn statement that she did not know what "buck" meant by explaining that she did not understand the term's meaning "at the time," and that its meaning became clear to her only after the event had taken place. So, in light of this evidence, there is a reasonable probability that the jury could have found Ms. Grunwald's ability to understand Mr. Garcia's intentions at the time to be less than that of a reasonable person.[46] Accordingly, the court of appeals erred in framing the mental state requirement in objective terms.[47]

---

normal student did to be able to understand it." Justice Lee categorizes this disability as a "reading" disability and argues that it has "no bearing" on her ability to understand statements delivered orally. *Infra* ¶ 109 (Lee, A.C.J., dissenting). But Ms. Grunwald's testimony clearly indicates that her struggles were not limited merely to reading. Instead, it shows that she struggles generally with language comprehension.

[46] Quoting our decision in *Garcia*, Justice Lee argues that our use of the phrase "could have," rather than "would have," is significant because it creates "the look and feel of presuming, rather than finding, prejudice." *See infra* ¶ 111 (Lee, A.C.J., dissenting) (quoting *Garcia*, 2017 UT 53, ¶ 38). But, when used to discuss reasonable probabilities, "could" and "would" are synonymous. In fact, in using the phrase "could have," we are merely using the same language we used in *Garcia*. *See Garcia*, 2017 UT 53, ¶ 42 ("A proper analysis also needs to focus on the evidence before the jury and whether the jury *could reasonably have* found that [the defendant] acted . . . such that a failure to instruct the jury properly undermines confidence in the verdict." (emphasis added)). So our use of the phrase is consistent with our case law. And because, in this context, the phrases "could have" and "would have" are synonymous, our use of the phrase in

(Continued)

¶41 Second, the court also erred in treating as undisputed the timeline of events occurring inside the truck immediately before the shooting. Although Ms. Grunwald testified on cross-examination that Mr. Garcia had expressed his intention to "buck" Sergeant Wride in the head before the truck had shifted into gear, on direct-examination, Ms. Grunwald stated he had made the comment long after the truck had been shifted into gear. This raises a critical factual dispute.

¶42 The dash-cam recording of the incident shows that the truck shifted into gear approximately thirteen minutes into the stop. The shooting occurred approximately four and a half minutes later. In the intervening time, Mr. Garcia popped open the truck's side window, and, a little later, the truck lurched forward slightly. And less than one minute after the truck lurched forward, or approximately seventeen and a half minutes into the stop, Mr. Garcia began firing. Ms. Grunwald testified that she thought Mr. Garcia had popped open the truck's side window to get a better look at Sergeant Wride's vehicle, and that the truck's movement was caused when Mr. Garcia climbed into the truck's back seat. So Mr. Garcia's activity inside the truck suggests that he spent the four and a half minutes between the time the truck shifted into gear and the time of the murder preparing to shoot at Sergeant Wride.

¶43 Whether Ms. Grunwald knew that Mr. Garcia intended to murder Sergeant Wride, or whether she was merely reckless in

---

no way lessens the standard established in *Strickland*. *See infra* ¶ 104 (Lee, A.C.J., dissenting).

[47] Justice Lee disagrees with our conclusion on this point. *Infra* ¶ 112 (Lee, A.C.J., dissenting). But the crux of his disagreement (on this point and others) appears to be that he finds Ms. Grunwald to lack credibility as a witness. *See infra* ¶ 96 (Lee, A.C.J., dissenting) (assuming the jury would find Ms. Grunwald's testimony to be "utterly lacking in credibility," and so would "likely . . . disregard all her other claims of misunderstanding"); *infra* ¶ 112 (Lee, A.C.J., dissenting) (assuming that the jury "would be offended by [Ms.] Grunwald's" testimony); *infra* ¶ 113 (Lee, A.C.J., dissenting) (assuming a "reasonable jury would discount anything and everything in [Ms.] Grunwald's testimony that went in her favor"). We do not believe we are in a position to make the kind of unequivocal credibility determinations upon which Justice Lee rests his determination.

disregarding the possibility that he might do so, likely depends on which version of events the jury believed. If the jury believed Mr. Garcia had expressed his intent to "buck" Sergeant Wride before the truck shifted into gear, then the jury would likely have viewed Ms. Grunwald's actions during the intervening four and a half minutes differently than if it had believed Mr. Garcia made his comment immediately before he commenced shooting.[48] Under the latter scenario, Ms. Grunwald would have had little time to process or otherwise react to the comment, and none of Ms. Grunwald's actions, which allegedly aided Mr. Garcia, could have been done with knowledge of what Mr. Garcia intended to do.[49] Thus, when the

---

[48] Justice Lee argues that the jury would not have accepted the carefully narrated timeline Ms. Grunwald depicted on direct-examination because he sees "every reason to think that a reasonable jury would discount anything and everything in [her] testimony that went in her favor." *Infra* ¶ 113 (Lee, A.C.J., dissenting). The only justification for Justice Lee's complete disregard of any testimonial evidence in Ms. Grunwald's favor is that she "made the ridiculous assertion" that she did not understand the "buck" threat made by Mr. Garcia. *Infra* ¶ 113 (Lee, A.C.J., dissenting). But we are ill-positioned to make such an absolute determination regarding how the jury would have assessed Ms. Grunwald's credibility. At trial, the jury heard two different stories, and on "this record, we have no way of knowing how the jury processed these two stories. Thus, we cannot properly conclude that the jury found [the defendant's entire] account '[in]credible,' as [Justice Lee] suggests." *State v. Barela*, 2015 UT 22, ¶ 30, 349 P.3d 676. So even though it appears that the jury did not accept Ms. Grunwald's story "lock, stock, and barrel," the jury could have found that portions of her testimony were credible. *Id.*

[49] Justice Lee takes issue with our characterization of the statement as coming "immediately before" the shooting. In so doing, he suggests that fifty seconds provided Ms. Grunwald sufficient time to process Mr. Garcia's meaning, formulate an alternative plan of action, and execute that plan of action before Mr. Garcia began firing. *Infra* ¶ 115 (Lee, A.C.J., dissenting). Indeed, he argues there is "no reason to think that the jury believed [Ms.] Grunwald didn't have 'time to process or otherwise react to the comment.'" *Infra* ¶ 115 (Lee, A.C.J., dissenting). Although it is possible that the jury would view the situation as Justice Lee suggests, we conclude that a jury

(Continued)

uncertainty in the timing of events is acknowledged, there is a reasonable probability that the jury convicted Ms. Grunwald based on a finding of a reckless mental state rather than on a finding of a knowing one.

¶44 In fact, as we discussed above, the only direct evidence of Ms. Grunwald's mental state at the time suggests she did not understand that Mr. Garcia intended to kill Sergeant Wride. Ms. Grunwald testified that she did not know Mr. Garcia intended to kill Sergeant Wride, and that even after Mr. Garcia had shot his gun, she assumed he had merely attempted to disable the police car. And even though she admitted that she heard Mr. Garcia say he was going to "buck" Sergeant Wride in the head, she testified that she did not know what this statement meant at the time, and that Mr. Garcia refused to clarify his meaning when she asked him to do so. So once it is acknowledged that Mr. Garcia's statement may have been made immediately before the shooting occurred, rather than four and a half minutes before, Ms. Grunwald's repeated insistence at trial that she did not understand what Mr. Garcia meant by this comment at the time becomes more believable. Accordingly, the evidence on record suggests that there is a reasonable probability that the jury believed her when she said she did not know what Mr. Garcia was going to do, but that it nevertheless convicted Ms. Grunwald based on a finding that she was reckless in disregarding the possibility that Mr. Garcia would commit the murder.

¶45 This conclusion is strengthened by the comments of Ms. Grunwald's trial counsel during closing arguments. There, Ms. Grunwald's trial counsel failed to contest that Ms. Grunwald had a reckless mental state. Addressing the jury, trial counsel stated the following: "Remember intent. Remember knowing. She has to have had some view of what he was doing and where he was going for her to be implicated as a party. . . . I'm going to ask you to find her not guilty, based on compulsion, based on a lack of intent, based on a lack of knowledge, foresight, call it what you want. Read the

could reasonably have found that Ms. Grunwald's failure to take affirmative steps to prevent a murder during the fifty seconds following Mr. Garcia's comment did not make her a knowing or intentional accomplice.

21

instructions carefully."[50] So trial counsel expressly argued that she did not have an intentional or knowing mental state, but failed to cast doubt on the possibility of her having had a reckless mental state. And because the record evidence related to Ms. Grunwald's mental state makes it reasonably probable that Ms. Grunwald was, at most, only aware that her conduct *could* help Mr. Garcia commit the crime (rather than being aware that her conduct was *reasonably certain* to help Mr. Garcia commit the crime), we conclude there is a reasonable probability that the failure of Ms. Grunwald's trial counsel to argue against a recklessness finding led the jury to convict Ms. Grunwald on that ground.

¶46   In sum, the court of appeals erred in failing to consider what Ms. Grunwald's subjective understanding was at the time (rather than what a reasonable person would have understood); and in treating the relevant timeline of events as undisputed. Because it is possible that Mr. Garcia made his "buck" comment immediately before shooting (rather than four and a half minutes before), and trial counsel failed to argue against a recklessness finding during closing arguments, there is a reasonable probability that the jury would not have convicted Ms. Grunwald absent the inclusion of "recklessness" in the instruction. For these reasons, the court of appeals erred in rejecting the possibility that the jury convicted based on a finding of recklessness. So we hold that its inclusion undermines our confidence in the verdict and thus prejudiced Ms. Grunwald.

---

[50] In his dissent, Justice Lee suggests trial counsel's reference to "foresight" was an attempt to cast doubt on the possibility of a recklessness determination. *Infra* ¶ 116 (Lee, A.C.J., dissenting). But it seems unlikely the jury would have equated the trial counsel's reference to a lack of "foresight" with an attack on the "recklessness" mental state requirement. So even if trial counsel intended his "foresight" comment to be a reference to the "recklessness" requirement, his failure to explicitly mention "recklessness" supports our conclusion that there is a reasonable probability the jury based Ms. Grunwald's conviction on a finding of recklessness.

## II. There is a Reasonable Probability the Jury Convicted
## Ms. Grunwald for Aiding Mr. Garcia in Some Way Unconnected to
## the Commission of the Murder at Issue

¶47 The instruction also erroneously permitted conviction based on intentional aid that was not directly connected to the murder. As we explained in *State v. Briggs*, to prove accomplice liability, the State must show that the defendant acted "with the intent to aid the principal actor *in the offense*."[51] And in *State v. Jeffs*, we rejected an interpretation of the accomplice liability statute that would have allowed accomplice liability to be found where a person had "act[ed] intentionally, knowingly, or recklessly in the abstract" because such an interpretation "would sweep in too much innocent behavior."[52] So under our interpretation of the accomplice liability statute in *Briggs* and *Jeffs*, and under the text of the accomplice liability statute, an accomplice's aid to the principal actor of the crime must also be directed toward the commission of the crime.[53]

¶48 In this case, the jury instruction permitted the jury to convict Ms. Grunwald if she intentionally aided Mr. Garcia, *who* committed the crime. The instruction should have read that Ms. Grunwald was guilty if she intentionally aided Mr. Garcia *to* commit the crime. As the court of appeals pointed out, by "substituting the word 'who'

---

[51] 2008 UT 75, ¶ 13, 197 P.3d 628 (emphasis added).

[52] 2010 UT 49, ¶ 46, 243 P.3d 1250.

[53] We clarify that, under our accomplice liability statute, aid given to a principal actor after the underlying crime has been committed is insufficient to establish accomplice liability if the alleged accomplice did not have the requisite mental state at the time the crime was committed. *See State v. Bowman*, 70 P.2d 458, 461 (Utah 1937) ("If he was an accessory after the fact, he could not become a partaker of the guilt, as there would be no union of criminal intent and act." (citation omitted)). Our opinion in *Jeffs* is clear on this point. It states that even less-than-innocent behavior does not "appropriately categorize an individual as an accomplice if that individual had no intention that the underlying crime be committed." *Jeffs*, 2010 UT 49, ¶ 48. And, as an example, we cited a previous holding that "a man who knew that a woman wanted to kill her father and who concealed the murder weapon after the crime was committed was not an accomplice." *Id.* (citing *State v. Schreuder*, 726 P.2d 1215, 1220 (Utah 1986)).

[for the word 'to,'] the instruction permitted the jury to find [Ms.] Grunwald guilty if she . . . aided [Mr.] Garcia in any way, so long as [Mr.] Garcia committed [aggravated murder]."[54] Thus this instruction permitted the jury to convict Ms. Grunwald based on conduct that was not directly connected to the murder. This was also error.

¶49 Although the court of appeals recognized that this error in the jury instruction permitted the jury to convict Ms. Grunwald based on a finding that she helped Mr. Garcia in some way unrelated to the commission of the crime at issue, it ultimately concluded there was "no reasonable probability that the jury convicted [Ms.] Grunwald because she aided [Mr.] Garcia in some way other than to commit the crime of aggravated murder."[55] In support of this conclusion, the court of appeals explained that the "undisputed evidence showed that, after [Mr.] Garcia announced his intention, [Ms.] Grunwald applied the brake, enabling the truck to shift into drive" and that she "held her foot on the brake for three-and-a-half minutes while [Mr.] Garcia shifted in his seat to get into position to fire."[56] But, as we explained above, the timing of events in this case is far from undisputed. And the court's reliance on a disputed timeline is even more problematic in regard to this issue.

¶50 Whether Mr. Garcia stated that he wanted to "buck" Sergeant Wride before or after Ms. Grunwald placed her foot on the brake is crucial to determining whether Ms. Grunwald intentionally aided Mr. Garcia to commit the murder. As the court of appeals noted, the State focused primarily on Ms. Grunwald's act of putting her foot on the brake while Mr. Garcia prepared to fire. So if the jury believed that Mr. Garcia made his "buck" comment immediately before he began shooting, all of her conduct, which allegedly constituted intentional aid, would have occurred before Ms. Grunwald heard the comment. In other words, there would be

---

[54] *State v. Grunwald*, 2018 UT App 46, ¶ 39, 424 P.3d 990.

[55] *Id.* ¶ 51.

[56] *Id.* The dash-cam footage shows that Ms. Grunwald held her foot on the brake for roughly four and a half minutes. Approximately three minutes and forty seconds after Ms. Grunwald placed her foot on the brake, Mr. Garcia moved to the back seat of the truck. And approximately fifty seconds later, he opened the truck's rear window and began firing.

no evidence that Ms. Grunwald's conduct was done with the purpose of helping Mr. Garcia prepare to commit the crime.[57] We therefore cannot be certain that the jury found that Ms. Grunwald's act of putting her foot on the brake was intentionally done *to* aid Mr. Garcia in committing the murder.

¶51 Instead, the jury could have determined that Ms. Grunwald had placed her foot on the brake at Mr. Garcia's insistence, or for some other reason, even though she did not know that by so doing she was assisting him in committing a murder. Under this factual scenario, Ms. Grunwald would be assisting someone *who* committed murder, but she would not be assisting someone *to* commit murder. So, because it is unclear from the record whether Ms. Grunwald put her foot on the brake before Mr. Garcia stated his intention to "buck" Sergeant Wride, there is a reasonable probability the jury would not have concluded that Ms. Grunwald's act of putting her foot on the brake was done to intentionally aid Mr. Garcia to commit the murder.[58]

---

[57] We note that the acts purportedly forming the basis of Ms. Grunwald's accomplice liability for aggravated murder seem fairly innocuous when we do not assume she did them with the intent to aid in Sergeant Wride's murder. In other words, there is nothing inherent in the acts of putting a foot on a brake and looking out of a car window during a police stop to suggest the acts were done with criminal intent. For this reason, those acts do not support a conviction unless they are considered in connection with Mr. Garcia's "buck" comment. So, once it is acknowledged that those acts may have occurred before Mr. Garcia expressed his intent to "buck" Sergeant Wride, they carry little persuasive weight. Justice Lee disagrees with this point. And in so doing, he assumes Ms. Grunwald's act of keeping her foot on the brake could only have had one purpose—to assist in murder. *Infra* ¶ 120 (Lee, A.C.J., dissenting) (assuming that the jury would have found that Ms. Grunwald kept her foot on the brake for the purpose of keeping "the truck steady as [Mr.] Garcia fired five shots out the back"). But, in the absence of any supporting direct evidence, we cannot join Justice Lee in making such an assumption.

[58] Additionally, we note that it is potentially problematic to hold Ms. Grunwald criminally liable for aggravated murder for the continued act of holding her foot on the brake. Although Mr. Garcia's "buck" comment could support the inference that

(Continued)

¶52 It is also reasonably probable that the jury convicted Ms. Grunwald based on a finding that she intentionally aided Mr. Garcia for some other purpose. For example, the jury could have concluded that Ms. Grunwald intentionally held her foot on the brake and acted as a lookout and getaway driver in order to aid Mr. Garcia in disabling the police officer's vehicle. The evidence on record supports this possibility. Ms. Grunwald testified that even after Mr. Garcia fired his gun, she did not believe he had killed Sergeant Wride. Instead, she testified that she thought he had tried to disable the police car.

¶53 The jury also could have convicted Ms. Grunwald based on a finding that she aided Mr. Garcia to avoid arrest, rather than to commit murder. And the record evidence makes this reasonably probable. For example, it is clear from the record that Ms. Grunwald aided Mr. Garcia by not telling Sergeant Wride about Mr. Garcia's gun, warrant, or true identity. And the State's primary theory of the case was that Ms. Grunwald helped Mr. Garcia avoid arrest so they

---

Ms. Grunwald held her foot on the brake with the intent or knowledge that by so doing she was aiding Mr. Garcia to commit murder, it is unclear what else Ms. Grunwald could have done once Mr. Garcia announced his intentions. She could have driven away or taken her foot off the brake, thereby allowing the truck to roll away. But either of these actions would have been inconsistent with Sergeant Wride's instructions to wait. And they would not necessarily have prevented Mr. Garcia from shooting Sergeant Wride. She also could have put the truck in park. But, again, this would not have prevented Mr. Garcia from committing the murder. So even if the evidence clearly demonstrated that Ms. Grunwald continued holding her foot on the brake long after Mr. Garcia announced his intention to "buck" Sergeant Wride, her continued act of holding her foot on the brake does not inevitably lead to the conclusion that she was doing so to aid Mr. Garcia to commit murder. *See Jeffs*, 2010 UT 49, ¶ 47 (explaining that a person does not incur accomplice liability merely because he or she provides an opportunity for one who is disposed to commit a crime). Justice Lee suggests that the "whole point of having [Ms.] Grunwald put her foot on the brake was to give [Mr.] Garcia a quick getaway." *Infra* ¶ 127 (Lee, A.C.J., dissenting). But this unsubstantiated suggestion fails to address our concern on this point and it assumes the very thing—Ms. Grunwald's purpose in holding her foot on the brake—that the jury instruction error prevents us from knowing in this case.

would not be separated. So, when this evidence is considered together with Ms. Grunwald's unrebutted testimony that she did not know Mr. Garcia intended to murder Sergeant Wride, there is a reasonable probability the jury convicted her for aiding someone *who* committed murder rather than by aiding someone *to* commit murder.[59] And this creates a reasonable probability the jury would not have convicted her absent the jury instruction error.

¶54 Additionally, the jury could have convicted Ms. Grunwald based on the finding that she helped Mr. Garcia by doing the things he told her to do, even though she did not know that by doing them she was aiding Mr. Garcia to commit murder. In other words, the jury could have found that she intentionally aided Mr. Garcia in the abstract by complying with his demands even though she did not know the purpose behind the demands. Her trial testimony is entirely consistent with this theory, and, as we discuss below, the jury's finding regarding compulsion does not necessarily undermine it.[60]

¶55 The court of appeals determined, however, that this last possibility was "highly improbable" because the State "focused solely" on actions close in time to the shooting during its closing argument.[61] But we cannot merely assume that the jury accepted the State's theory of the case. Instead, we must consider the totality of the evidence. And in considering this evidence, we must avoid making assumptions regarding a jury's thinking that go beyond what can be reasonably gleaned from the correct portions of a jury instruction.[62]

---

[59] Although the record clearly demonstrates that the State focused on Ms. Grunwald's efforts to help Mr. Garcia avoid arrest, Justice Lee states that there is only a remote possibility the jury convicted her on this basis. *Infra* ¶ 123 (Lee, A.C.J., dissenting). As with his other points of disagreement, this point appears to hinge on his assessment of Ms. Grunwald's credibility as a witness. But, again, we do not share Justice Lee's certainty that the jury would "discount anything and everything in [Ms.] Grunwald's testimony that went in her favor." *Infra* ¶ 113 (Lee, A.C.J., dissenting).

[60] *See infra* ¶¶ 63–75.

[61] *Grunwald*, 2018 UT App 46, ¶ 52.

[62] *See State v. Barela*, 2015 UT 22, ¶ 30, 349 P.3d 676.

¶56 For example, in *State v. Barela*, we held that we could not "properly conclude that the jury found [a rape victim's] account 'credible'" even though the jury had convicted the defendant of rape.[63] This was so, we explained, because an error in the jury instruction regarding the mental state requirement limited what we could assume about the jury's guilty verdict.[64] So, even though both sides told drastically different stories, and it was clear based on the conviction that the jury did not accept the defendant's story in full, we explained that the jury's apparent rejection of part of the defendant's story did not mean the "jury accepted [the victim's] story lock, stock, and barrel."[65] Instead, we explained that "[t]he jury could easily have thought that the truth fell somewhere in between the two accounts."[66]

¶57 Similarly, in this case we cannot assume that the jury accepted every aspect of the State's version of events. In arguing that Ms. Grunwald aided Mr. Garcia to commit murder, the State focused on her acts of placing her foot on the brake, shifting into gear, waiting with her foot on the brake in preparation for their escape, and acting as a lookout so that Mr. Garcia could open fire when no other cars were driving by. It is possible, however, that the jury came to different conclusions from these facts than the conclusions suggested by the State.[67] The court of appeals rejected the possibility that the jury found that Ms. Grunwald directed her actions to some purpose other than the commission of the principal crime solely because it was inconsistent with the theory the State presented during closing arguments. This was error. And, for the reasons discussed above, we find that the record evidence makes it reasonably probable that the jury determined that Ms. Grunwald

---

[63] *Id.* In that case, we determined that the jury instruction regarding the mental requirement as to defendant's understanding of the victim's consent was erroneous.

[64] *Id.*

[65] *Id.*

[66] *Id.*

[67] It is likewise possible that the jury came to different conclusions than those suggested by Justice Lee. *See infra* ¶ 126 (assuming that Ms. Grunwald's acts of looking out the window and putting her foot on the brake were done to assist in Sergeant Wride's murder).

intentionally aided Mr. Garcia, but not necessarily to help him commit murder. Accordingly, we conclude the court of appeals erred in concluding that this error did not result in prejudice.[68]

### III. There is a Reasonable Probability That the Jury Convicted Ms. Grunwald Based on a Finding That She Knew Mr. Garcia Was Going to Shoot Sergeant Wride, Even Though She Did Not Knowingly Aid Mr. Garcia's Commission of the Crime

¶58 Finally, the jury instruction also erroneously permitted conviction based on a finding that Ms. Grunwald knew *Mr. Garcia's* actions were reasonably certain to result in murder, rather than on a finding that *her* own actions were intended to help Mr. Garcia in committing murder.

¶59 Under Utah's accomplice liability statute, "[e]very person, *acting* with the mental state required for the commission of an offense . . . who solicits, requests, commands, encourages, or intentionally aids another person" to commit a crime "shall be

---

[68] Justice Lee characterizes our analysis on this point as a quarrel "over the sufficiency of the *actus reus* for which [Ms.] Grunwald was charged and convicted." *Infra* ¶ 128 (Lee, A.C.J., dissenting). But, because there was not a special verdict form, we do not know what *actus reus* the jury based its conviction upon. And the lack of a special verdict form compounds the problem caused by instructing the jury to determine whether Ms. Grunwald intentionally aided someone "who" committed murder instead of intentionally aiding someone "to" commit murder. Because of this error, the jury was permitted to convict Ms. Grunwald based on an act to assist Mr. Garcia for a non-criminal purpose. In other words, it may have allowed the jury to convict her for an act unrelated to the murder. Justice Lee acknowledges that the jury was incorrectly instructed on this point. But his analysis suggests that he assumes the jury would have premised its guilty verdict on only those acts that were done *to* assist in murder. *Infra* ¶¶ 126–28 (Lee, A.C.J., dissenting). So his analysis assumes as true the very thing the jury instruction error prevents us from knowing. Because the verdict form and the jury instructions do not inform us of the act upon which the jury based its guilty verdict, our analysis is focused on determining what acts the jury was reasonably probable to have based its decision on in light of the jury instruction error.

criminally liable as a party for such conduct."[69] So, under this statute, a person is not criminally liable unless he or she takes some action with the mental state required for the commission of the underlying offense. For this reason, the first step in applying accomplice liability is to determine whether the individual charged as an accomplice acted with the intent that an underlying offense be committed.[70]

¶60  "Additionally, when prosecuting an accomplice for *aiding* in the commission of a crime, the State must show that the accomplice had the intent to aid."[71] So, in this case, to prove that Ms. Grunwald was liable as an accomplice in Sergeant Wride's murder, the State needed to prove that she intentionally aided Mr. Garcia to commit the murder and that she so acted with the intent or knowledge that the murder would be committed.

¶61  In *State v. Jeffs*, we specifically discussed what it meant for an accomplice's action to be done with the *knowledge* that the underlying offense be committed.[72] We explained that "[a] person acts knowingly, or with knowledge, with respect to a result of *his* conduct when he is aware that *his* conduct is reasonably certain to cause the result."[73] And this language was taken directly from

---

[69] UTAH CODE § 76-2-202 (emphasis added).

[70] *See State v. Briggs*, 2008 UT 75, ¶ 14, 197 P.3d 628; *see also State v. Jeffs,* 2010 UT 49, ¶ 43, 243 P.3d 1250 (explaining that when we used the term "intent" in *Briggs*, we did so as "a legal term of art that means '[t]he state of mind accompanying an act.'" (quoting *Intent,* BLACK'S LAW DICTIONARY, 881 (9th ed. 2009) (alteration in original)).

[71] *Briggs*, 2008 UT 75, ¶ 15 (emphasis added).

[72] 2010 UT 49, ¶ 45.

[73] *Id.* (emphasis added) (citation omitted). We clarify that despite the use of the word "cause," our *Jeffs* opinion should not be read to require that an accomplice's conduct be a but-for cause of the underlying crime for liability to incur. Instead, the phrase "cause the result" used in our *Jeffs* opinion should be read to require only that the accomplice knowingly committed his or her own *actus reus* in order to help the underlying crime be committed. This reading of *Jeffs* is consistent with our case law. We have interpreted the accomplice liability statute (Utah Code section 76-2-202) to mean that an "accomplice must . . . have the intent that the underlying offense
(Continued)

Utah Code section 76-2-103(2), the provision defining a knowing mental state. So under statute and case law, to find a defendant guilty as a knowing accomplice, the jury must determine that the defendant was aware that the *defendant's conduct* was reasonably certain to "solicit[], request[], command[], [or] encourage[]" or "intentionally aid[]" the principal actor "to engage in conduct which constitutes an offense."[74] The knowing-mental-state instruction in this case failed to accurately describe this requirement.

¶62 The instruction in this case stated that the jury could convict Ms. Grunwald if the jury found she intentionally aided Mr. Garcia and she "[w]as aware that [*Mr. Garcia's*] conduct was reasonably certain to result in [Mr. Garcia] committing the crime of Aggravated Murder." Thus, the instruction permitted the jury to convict Ms. Grunwald if it found that she intentionally aided Mr. Garcia and was aware that his conduct would result in murder, even if she did not realize that her decision to aid Mr. Garcia would facilitate Mr. Garcia's commission of the crime. But, as our statement in *Jeffs* indicates, the instruction should have required a finding that Ms. Grunwald committed her *actus reus* in order to assist Mr. Garcia in committing the crime of aggravated murder. So the "knowing" instruction incorrectly described this requirement.[75]

---

be committed." *Briggs*, 2008 UT 75, ¶ 14. So, to "show that a defendant is guilty under accomplice liability, the State must show that an individual acted with both the [required mental state] that the underlying offense be committed and the [required mental state] to aid the principal actor in the offense." *Id.* ¶ 13. This means the State must show that the defendant knowingly or intentionally committed the *actus reus* to help the principal actor in committing the crime. We do not believe our use of the word "cause" in *Jeffs* was intended to alter this requirement.

[74] UTAH CODE § 76-2-202.

[75] We note, however, that had the jury instructions not contained the error discussed in Part II of this opinion (incorrectly allowing the jury to base a conviction on an action that assists someone "who" happened to commit murder instead of requiring the jury to base a conviction on an action done "to" assist someone in committing murder), the failure to reference Ms. Grunwald's conduct in the knowing-mental-state portion of the instruction may have been harmless. This is so because the use of the word "to" rather than "who" would have required the jury to find the necessary

(Continued)

¶63 As with the other errors, the court of appeals concluded there was not a "reasonable probability that the jury convicted [Ms.] Grunwald on the theory that she knew [Mr.] Garcia was going to shoot Sergeant Wride but did not know that her conduct would result in [Mr.] Garcia committing that crime."[76] According to the court, this was so because Ms. Grunwald's "defense at trial depended on the jury believing her claim that [Mr.] Garcia pointed his gun at her head, compelling her to assist him," and so the court assumed that by "returning a guilty verdict, the jury necessarily rejected" Ms. Grunwald's entire defense.[77] But this reasoning rests on a mischaracterization of Ms. Grunwald's trial strategy. And after correctly characterizing her trial strategy, and considering a totality of the evidence, we conclude there is a reasonable probability the jury convicted Ms. Grunwald based on a finding that she knew that Mr. Garcia intended to kill Sergeant Wride even though she did not knowingly hold her foot on the brake to assist him in doing so.

¶64 The court of appeals erred in characterizing the trial strategy of Ms. Grunwald's trial counsel. The State describes Ms. Grunwald's

---

connection between Ms. Grunwald's actions and Mr. Garcia's commission of the murder.

Additionally, we note that the court of appeals held that the jury instruction in this case contained three separate errors, and neither party has challenged this holding. And we organized our analysis accordingly. But, because the issues discussed in Parts II and this Part both concern a failure to connect Ms. Grunwald's actions to the underlying crime, we could have chosen to analyze the jury instruction language discussed in both Parts as though it constituted a single error. Had we done that, we would have analyzed how the reference to Mr. Garcia's conduct, rather than Ms. Grunwald's conduct, in the knowing-mental-state portion of the instruction served to amplify the prejudice created by the erroneous substitution of "who" for "to" in the earlier portion of the jury instruction. So even were we to conclude, as does Justice Lee in his dissent, that the reference to Mr. Garcia's conduct did not constitute an error on its own, that reference would still be relevant as part of our prejudice discussion of the single error in Part II. In other words, whether we characterize the jury instruction in this case as containing two errors, or three, does not affect our ultimate conclusion on this point.

[76] *State v. Grunwald*, 2018 UT App 46, ¶ 53, 424 P.3d 990.

[77] *Id.*

trial counsel as having conceded, by presenting a compulsion defense, that Ms. Grunwald intentionally aided Mr. Garcia to commit murder. But trial counsel never made such a concession. Although trial counsel's primary theory was that Ms. Grunwald took each of her actions because Mr. Garcia threatened her, he also argued that Ms. Grunwald neither intended for Mr. Garcia to kill Sergeant Wride nor knew that Mr. Garcia intended to do so.[78]

¶65 Speaking to the jury during closing arguments, trial counsel stated the following:

> Remember intent. Read those . . . instructions carefully. Remember intent. Remember knowing. She has to have had some view of what he was doing and where he was going for her to be implicated as a party. . . . I'm going to ask you to find her not guilty, based on compulsion, based on a lack of intent, based on lack of knowledge, foresight, call it what you want. Read the instructions carefully.

As these statements to the jury indicate, although trial counsel advanced a compulsion theory, he did not concede that Ms. Grunwald intentionally aided Mr. Garcia to commit the murder. Instead, he argued that although Mr. Garcia compelled her to act, she did not intend, or know, that her compliance with Mr. Garcia's demands would result in Sergeant Wride's death. For this reason, the court of appeals erred in concluding that Ms. Grunwald's defense at trial wholly depended on the jury accepting her compulsion defense.

¶66 The court of appeals also erred in concluding that the jury's alleged rejection of the compulsion defense left only one reasonable conclusion regarding Ms. Grunwald's mental state: "that [Ms.] Grunwald intended or knew that her conduct" would result in Mr. Garcia committing the crime of aggravated murder.[79] This conclusion is erroneous because it is based on an unfounded assumption and it fails to take a key portion of the jury instructions into account.

---

[78] He also argued that the State had failed to prove any planning or preparation.

[79] *Grunwald*, 2018 UT App 46, ¶ 53.

¶67 The court of appeals' conclusion is erroneous because it is based on an unfounded assumption. "In making the determination whether the specified errors resulted in the required prejudice, a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law."[80] In the context of an erroneous jury instruction, this means we should presume that the jury acted consistent with those parts of the instructions that were provided correctly, and "exclude the possibility of arbitrariness, whimsy, caprice, 'nullification,' and the like."[81] So in listing the possible scenarios in which the jury could have erroneously convicted the defendant, we must use the correct portions of the instructions as a parameter for what the jury could have possibly concluded.

¶68 For example, in this case "we [may] assume that the jury found beyond a reasonable doubt both that [Mr.] Garcia committed the principal crimes and that [Ms.] Grunwald 'intentionally, knowingly, or recklessly solicited, requested, commanded, encouraged, or intentionally aided' [Mr.] Garcia" in some way.[82] As the court of appeals noted, Ms. Grunwald "does not challenge these aspects of the accomplice jury instructions or the sufficiency of the evidence to support these findings."[83]

¶69 But even though we may assume the jury properly followed the correct portions of the jury instructions, we must also acknowledge that, absent a special verdict form, we "cannot determine with certainty whether [the defendant] was convicted on the basis of" one theory or another.[84] So we cannot make logical jumps or exclude any possible theory (or, in other words, any possible conviction scenario) until we consider a totality of the evidence. The court of appeals erred in this respect.

¶70 As we have discussed, the court of appeals based its prejudice determination on the assumption that "[i]n returning a guilty verdict, the jury necessarily rejected [Ms. Grunwald's]

---

[80] *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

[81] *Id.* at 695.

[82] *Grunwald*, 2018 UT App 46, ¶ 46.

[83] *Id.*

[84] *Jeffs*, 2010 UT 49, ¶ 38.

compulsion defense."[85] And for this reason, the court concluded that "the only reasonable conclusion from the evidence was that [Ms.] Grunwald intended or knew that *her* conduct . . . would result in [Mr.] Garcia committing the crime of aggravated murder."[86] But this conclusion did not necessarily follow from the jury's rejection of Ms. Grunwald's compulsion defense.

¶71 The jury was instructed that, under the defense of compulsion, "a person is not guilty of a crime if she acted because she was coerced to do so by (1) someone's use of unlawful force against her or someone else; or (2) someone's threat to use imminent unlawful force against her or someone else." So, based on the jury's rejection of the compulsion defense, we could reasonably conclude that the jury found that Ms. Grunwald acted of her own free will in some way.

¶72 But that does not inevitably lead to the conclusion that the jury found that Ms. Grunwald acted freely *and* knew or intended that her actions would assist Mr. Garcia in murdering Sergeant Wride. This may be a reasonable conclusion, but it is not the only reasonable conclusion that could be drawn. As we explained above, although Ms. Grunwald's trial counsel advanced a compulsion theory, he did not concede that Ms. Grunwald intentionally aided Mr. Garcia to commit the murder in question. Instead, he argued that although Mr. Garcia compelled her to act, she did not intend for Mr. Garcia to kill Sergeant Wride, nor did she know that by complying with Mr. Garcia's demands Sergeant Wride would die. So the jury could have concluded that even though Ms. Grunwald was not compelled to place her foot on the brake, she did not do so to help Mr. Garcia commit murder.

¶73 What is more, the court of appeals' conclusion regarding the jury's rejection of the compulsion defense ignores an important aspect of the compulsion instruction. In addition to the elements of compulsion listed above, the compulsion jury instruction also states that "[t]he defense of compulsion is not available if the defendant intentionally, knowingly, or recklessly placed herself in a situation where it was probable that she would be subjected to such duress." So, based on this language, the jury could have concluded that Ms. Grunwald did not act freely, but that the defense of compulsion

---

[85] *Grunwald*, 2018 UT App 46, ¶ 53.

[86] *Id.* (emphasis added).

did not apply because she had intentionally, knowingly, or recklessly placed herself in the situation in which her freedom was compromised. In other words, this aspect of the compulsion instruction introduces the possibility that the jury believed Ms. Grunwald when she testified that Mr. Garcia held a gun to her head, threatened her, and ordered her to put her foot on the brake, but that the jury nevertheless rejected her compulsion defense because she had intentionally, knowingly, or recklessly placed herself in the situation in which her freedom was compromised. And the record suggests that this conclusion is reasonably probable.

¶74 As Justice Lee notes in his dissent, Ms. Grunwald "clearly knew that her boyfriend was a violent person with a troubling criminal record" and "just weeks before [Sergeant] Wride's murder, [Ms. Grunwald] witnessed [Mr.] Garcia get into a heated argument with (and possibly even pull a gun on) her father."[87] And the record indicates that Mr. Garcia was extremely agitated when he was urging Ms. Grunwald to go on the car ride in which Mr. Garcia murdered Sergeant Wride. Based on this evidence, the jury could have concluded that Ms. Grunwald had intentionally, knowingly, or recklessly placed herself in a compromising situation. So the jury's rejection of Ms. Grunwald's compulsion defense does not tell us anything regarding whether Ms. Grunwald was a willing participant in the murder.[88]

¶75 Accordingly, the court of appeals erred in assuming that the jury found that Ms. Grunwald intended or knew that her conduct would assist in Mr. Garcia committing the crime of aggravated murder. Because we cannot assume, from the guilty verdict, that the jury found that Ms. Grunwald intended or knew that her conduct contributed to the crime at issue, we must consider the record evidence to determine whether there is a reasonable probability the jury convicted Ms. Grunwald based on a finding that she knew that

---

[87] *Infra* ¶ 93 (Lee, A.C.J., dissenting).

[88] Justice Lee likewise fails to account for this portion of the compulsion instruction. In his dissent, he states that, in his view, "the jury's rejection of the compulsion defense weighs against [Ms.] Grunwald's assertions of prejudice." *Infra* ¶ 92 (Lee, A.C.J., dissenting). But, because we do not know the basis for the jury's rejection of the compulsion defense, this rejection does not weigh one way or the other.

Mr. Garcia was going to commit the crime, but did not knowingly act to help him commit the crime. We conclude there is.

¶76 The evidence on record supports a reasonable probability that the jury convicted Ms. Grunwald based on her knowledge of Mr. Garcia's intentions, rather than on any awareness of her own role in the murder. For example, even though Ms. Grunwald testified that she heard Mr. Garcia say he was going to "buck" Sergeant Wride, she testified that this statement was made after she had already been holding her foot on the brake for a number of minutes and shortly before Mr. Garcia began shooting.

¶77 So the jury could have simultaneously accepted this testimony, which suggests she did not know that her own conduct would aid Mr. Garcia in committing murder, while also finding her guilty because the testimony suggests that immediately before the shooting, but after she aided Mr. Garcia, she may have become aware of Mr. Garcia's intentions. Accordingly, we conclude there was a reasonable probability that the jury found that Ms. Grunwald did not commit any act with the purpose of helping Mr. Garcia commit murder, but that it nevertheless convicted her based on the finding that she knew Mr. Garcia was going to shoot Sergeant Wride.

## Conclusion

¶78 Because the jury instruction discussing the elements for accomplice liability on aggravated murder contained three errors, and there is a reasonable probability that the jury would not have convicted Ms. Grunwald in the absence of those errors, our confidence in the guilty verdict is undermined. Accordingly, we reverse her aggravated murder conviction and remand for a new trial.

––––––––––

ASSOCIATE CHIEF JUSTICE LEE, dissenting:

¶79 In January 2014, Sergeant Cory Wride noticed Meagan Grunwald's truck stopped on the side of the highway and pulled over to investigate. This would be the last act of public service he would ever perform. As Wride sat in his vehicle, Grunwald placed her foot on the brake to allow her boyfriend, Jose Garcia, to shift the truck into drive and aim a gun through the rear window. Grunwald held the truck steady as Garcia made good on his promise to "buck [Wride] in the fucking head" by firing seven bullets into Wride's patrol car. Wride died shortly thereafter.

¶80 Grunwald and Garcia continued their rampage as the police gave chase. At one point, Grunwald slowed her truck down to allow Garcia to shoot and wound another officer. After their truck was disabled, Grunwald waved down a passing vehicle so Garcia could order a pregnant driver and her child out of the car. The chase ended in a fatal shootout after Grunwald and Garcia abandoned their stolen vehicle and ran toward another. As Garcia lay bleeding and dying, Grunwald began screaming at the police, "You fucking ass holes, you didn't have to shoot him. You fucking shot him. Oh my God, you fucking shot him."

¶81 Grunwald pleaded not guilty to all charges, asserting a compulsion defense and claiming that Garcia had kidnapped her and threatened to kill her and her family. The jury found her guilty as charged, convicting her for (among other things) acting as an accomplice to the aggravated murder of Sergeant Wride.

¶82 Grunwald challenged her convictions on appeal, asserting in part that her trial counsel was ineffective for failing to object to errors in the jury instruction related to her murder charge. The instruction allowed the jury to convict Grunwald as an accomplice to aggravated murder if it found that she "[i]ntentionally, knowingly, or recklessly solicited, requested, commanded, encouraged, *or* intentionally aided [Garcia] who" committed the elements of the principal crime and it also found that she "[i]ntended that [Garcia] commit the [principal crime], or . . . [w]as aware that [Garcia's] conduct was reasonably certain to result in [Garcia] committing the [principal crime], or . . . [r]ecognized that her conduct could result in [Garcia] committing the [principal crime] but chose to act anyway . . . ." *State v. Grunwald*, 2018 UT App 46, ¶ 31, 424 P.3d 990 (internal quotation marks omitted) (emphasis in original). Grunwald identified three alleged errors in this instruction. She claimed that it erroneously allowed a conviction if Grunwald (1) "recklessly" aided Garcia, (2) aided Garcia in some way unconnected to Wride's murder, or (3) aided Garcia knowing that his actions (as opposed to her own) were reasonably certain to result in Wride's murder. *Id.* ¶ 32.

¶83 The court of appeals agreed that the jury instructions were in error on all three counts and concluded that Grunwald's counsel was deficient in failing to object to them. *Id.* ¶¶ 24, 32. But it upheld Grunwald's conviction as an accomplice to aggravated murder because she failed to show prejudice. *Id.* ¶ 54. It held that Grunwald had not established that there was a reasonable probability that a

correct jury instruction would have led to a different outcome at trial. *Id.* ¶ 49.

¶84 The court of appeals got the prejudice analysis right. The majority is wrong to overturn its decision and reverse Grunwald's conviction despite the overwhelming evidence against her. Grunwald was no idle, ignorant bystander. She was at least a knowing collaborator in her boyfriend's acts of murder—as evidenced by her knowledge of his criminal background, threats against her father, violent behavior on the way to the murder scene (firing shots out the car window), and stated intention to shoot Sergeant Wride in the head, as well as her own participation in the second shooting and carjacking that followed.

¶85  I agree that the first two errors alleged by Grunwald should have generated an objection from trial counsel. But I respectfully dissent because I disagree with the majority's prejudice analysis both on the law and under the facts in the record. The majority's prejudice analysis is legally problematic because it turns on an assessment of what the jury likely *did* or *could have done* with an *incorrect* jury instruction. *See supra* ¶¶ 36, 40, 43–44, 52–54, 63, 75–77. But this is not the governing standard of prejudice. In a case (like this one) involving a claim for ineffective assistance of counsel, the standard for assessing prejudice turns on what a jury *would reasonably likely have done* with a *correct* jury instruction. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984). I dissent from the court's attempt to revise and reformulate this standard. And I also dissent from the majority's conclusion that Grunwald carried her burden of establishing prejudice under this standard. For reasons noted above and explained further below, I see no basis for a determination of a reasonable probability that a properly-instructed jury would have acquitted Grunwald of the charge against her.

¶86 The court of appeals concluded that the jury instruction in this case contained a third error—the failure to require proof that Grunwald knew her own actions were "reasonably certain to result in" Wride's murder. *Grunwald*, 2018 UT App 46, ¶ 46. This requirement is arguably rooted in dicta in our opinion in *State v. Jeffs*, 2010 UT 49, ¶ 45, 243 P.3d 1250. But that dicta is incompatible with the terms and conditions set forth in Utah Code section 76-2-202 as interpreted in our opinion in *State v. Briggs*, 2008 UT 75, 197 P.3d 628. And the majority in this case rightly repudiates the dicta and clarifies the governing standard. *See supra* ¶ 61 n.73. I endorse that portion of the majority opinion but conclude that the repudiation of the dicta in

*Jeffs* effectively collapses the third alleged error in the jury instruction into the second.

¶87  In the paragraphs below I consider each of the alleged errors noted above and explain the basis for my dissenting position. First I acknowledge that counsel was deficient in failing to object to an instruction allowing the jury to convict Grunwald if it found she only "recklessly" aided Garcia in the murder, but I conclude that there is no reasonable probability that a properly-instructed jury would have entered an acquittal. Next I concede that counsel was deficient in failing to object to an instruction allowing the jury to convict Grunwald if it found that she helped Garcia for some purpose other than to kill Wride, but again I determine that this error did not result in prejudice. And lastly I endorse the majority's decision to repudiate dicta in *Jeffs* requiring that an accomplice know that her own actions themselves are reasonably certain to result in the principal crime.

I

¶88  I agree with the majority that trial counsel was deficient in failing to object to a jury instruction allowing the jury to convict Grunwald if it found that she only "recklessly" aided in Garcia's commission of aggravated murder. *See supra* ¶ 34. But I see no basis for the conclusion that the failure to object to this instruction was prejudicial.

A

¶89  The standard for judging *Strickland* prejudice is set forth in controlling precedent from the United States Supreme Court. Our own decisions have also elaborated on the standard. A showing that trial counsel was deficient is not alone sufficient to justify a reversal. The defendant must also establish prejudice under a counterfactual analysis, showing that there is a "reasonable probability" that "the result of the proceeding would have been different" absent counsel's errors. *Strickland v. Washington*, 466 U.S. 668, 694 (1984); *see also State v. Garcia*, 2017 UT 53, ¶¶ 28, 42, 424 P.3d 171 (stating that, in the context of counsel's failure to object to erroneous jury instructions, the court must "ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors" (quoting *Strickland*, 466 U.S. at 695–96)).

¶90 We have clarified that "[a] reasonable probability of a different outcome is in no way synonymous with . . . 'any reasonable basis in the evidence.'" *Garcia*, 2017 UT 53, ¶ 44 (citation omitted). The "reasonable probability" standard is a "relatively high hurdle to overcome." *Id.* It is not enough to merely "show that the errors had

some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. The probability of a different outcome must be "reasonable." *Id.* at 694. And here I see nothing more than a conceivable possibility that a jury that had been properly instructed to find that Grunwald's intentional aid was given intentionally or knowingly (and not merely recklessly) would have rendered a different verdict.

¶91 In convicting Grunwald, the jury rejected her defense that she was compelled to act as Garcia's accomplice. And with good reason. Not only did Grunwald hold the brake for several minutes as the pair waited for a gap in traffic, she did so even as Garcia announced his intention—twice—to "buck [Wride] in the fucking head." And she prevented the truck from jerking forward until Garcia had fired five of his seven shots out the rear window.

¶92 The jury's rejection of the compulsion defense may not necessarily mean that the jury rejected all of Grunwald's arguments. *See supra* ¶¶ 56–57. But the jury verdict can inform our analysis of whether it is reasonably probable that a properly‗instructed jury would have reached a different verdict. And the jury's rejection of the compulsion defense weighs against Grunwald's assertions of prejudice in light of the totality of the evidence in the record.

¶93 The record evidence that Grunwald knowingly assisted in her boyfriend's murder of Sergeant Wride was extensive and compelling. First we should consider the knowledge that Grunwald brought with her on the day of the murder. She clearly knew that her boyfriend was a violent person with a troubling criminal record. She had told a friend that Garcia had been in prison for "almost kill[ing] a guy" with a screwdriver. She testified that she was aware that he had been convicted of manslaughter and that her cousin had told her about his "previous crime" and sent her an article with "some pretty serious facts in it." And just weeks before Wride's murder, she witnessed Garcia get into a heated argument with (and possibly even pull a gun on) her father.

¶94 Grunwald took this knowledge with her when she got into the truck with Garcia on the day of the murder. And she could not have reasonably thought that they were going out for a cruise; when Grunwald initially resisted Garcia, saying that she needed to pack, Garcia angrily threatened, "If you don't go with me, stuff's going to happen." Garcia's actions en route to the murder scene would not have dispelled Grunwald's understanding of Garcia's mindset. As they drove past a Maverik convenience store, Garcia fired two

gunshots out the window. And when Wride pulled up behind them, Garcia vowed he was "not going back to prison."

¶95 This is the background against which the jury would have considered Grunwald's testimony about Garcia's threats to "buck" Wride in the "head." Garcia made those threats while readying and positioning his gun to fire out the back window of the truck. Under these circumstances, there could have been no doubt about Garcia's intentions. Surely he wasn't talking about the "head" of the officer's car. He was speaking of shooting the officer dead in the head—a move that, again, could not have been a surprise to Grunwald given her knowledge of her boyfriend's past and his actions earlier that day.

¶96 Granted, Grunwald testified that she didn't understand that Garcia was talking about killing Sergeant Wride. But the jury was entitled to find that testimony utterly lacking in credibility. And in light of all of the evidence set forth here, I conclude that any reasonable jury would have done just that—and thus would also have been likely to disregard all her other claims of misunderstanding. This thoroughly devastates Grunwald's assertions of prejudice. If any reasonable jury would have found that she was lying about not knowing what Garcia meant when he threatened to "buck him" in the "head," and therefore found her to lack credibility as a witness, then there is no reasonable probability that a properly-instructed jury would have found that she acted only recklessly.

¶97 The majority faults me for "disregard[ing] the only direct evidence we have of what occurred inside Ms. Grunwald's truck"— Grunwald's testimony. *Supra* ¶ 30. But I am not disregarding that testimony. I am viewing it in light of all the evidence in the record— what occurred outside and inside the truck. Some of the relevant evidence is direct and some is circumstantial. But nothing in our law requires us to credit direct evidence over circumstantial evidence. When the direct evidence (testimony) is utterly lacking in credibility, the law is to the contrary. The prejudice inquiry asks about reasonable probabilities, and that necessarily requires us to make a counterfactual determination as to how a properly-instructed jury would have assessed all the evidence.

¶98 The majority breaks two points of new ground in concluding otherwise: (a) it suggests that "direct" testimony is somehow categorically more weighty in *Strickland* prejudice analysis, *supra* ¶¶ 30, 50 n.57; and (b) it rejects the propriety of credibility assessments and "assumptions" about what the jury

would do with the considerations that I have highlighted, *see supra* ¶¶ 30, 40 n.47, 43 n.48, 53 n.59. But these premises are incompatible with controlling precedent from the U.S. Supreme Court. *Strickland* prejudice is all about the counterfactual. *See* 466 U.S. at 694. And that counterfactual analysis is to be performed in light of the "totality" of the evidence in the record—not just some of it. *See id.* at 695 ("[A] court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury."). The majority alters that construct in its decision today. Fidelity to binding precedent requires us to consider any and all evidence in the record in conducting the *Strickland* prejudice inquiry. Circumstantial evidence cannot be categorically discounted. Nor can we be required to forgo an assessment of the reasonable likelihood of a jury's assessment of a witness's credibility.[89] And the majority's contrary conclusion today will confuse and distort our law going forward.

¶99 The majority's prejudice analysis is also undermined by Grunwald's actions after Wride's murder. In the hour and a half between the shooting and the police chase, Grunwald had a phone conversation with her mother. She appears to have been completely calm—her mother could remember nothing important about the call, while Grunwald testified that her mother simply asked whether she was okay and whether she had taken the garbage out.[90] After the police chase began and Grunwald and Garcia abandoned Grunwald's truck near the Nephi Main Street exit, Grunwald ran after Garcia, following "wherever he went." As they ran toward the underpass, Garcia fired several shots at officers and vehicles near the

---

[89] The majority's complaint about my determination of the jury's likely assessment of Grunwald's credibility is perplexing. Nothing in the *Strickland* line of cases requires us to take a defendant's testimony as gospel truth in deciding whether a reasonable jury would have come to a different conclusion with a different jury instruction. The majority's criticism is especially troubling given the fact that Grunwald's testimony—the "direct evidence" it makes so much of—was inconsistent and contradictory. *See infra* ¶ 113. The majority repeatedly claims that its own prejudice analysis is based on the "totality of the evidence." *See supra* ¶¶ 18, 27, 30, 36, 38, 55, 63, 69. I see no way to reconcile those points with its attempt to remove from consideration the evidence that I have identified.

[90] During this time, Garcia also called his uncle, saying, "I'm fine. I'm with my girlfriend's family. They're protecting me. I'm good."

freeway exit. Not once did he need to point his gun at Grunwald to make her do his bidding. And not once did she express any degree of misunderstanding about his plan. It was Grunwald, moreover, not Garcia, who waved down and stopped the vehicle that the duo carjacked. And when Garcia fled from that vehicle and began running toward another, Grunwald again followed. When the officers finally shot and stopped Garcia, Grunwald directed her anger at the *police*, purportedly shouting, "You fucking ass holes, you didn't have to shoot him. You fucking shot him. Oh my God, you fucking shot him." Grunwald later called the police "fucking hoes" as she sat in the police car.

¶100 By Grunwald's own admission, she never expressed gratitude for or relief at being "rescued" from Garcia. As the police collected her belongings, she refused to surrender a ring that Garcia had given her. And after her arrest, Grunwald sent a letter to her uncle with a hand-drawn picture of a female hand and a skeleton hand forming a heart, the word "LOVE" gracing a ring on one of the female's fingers.

¶101 For these reasons I find it nearly impossible to look at Grunwald's actions and conclude that her involvement was anything but knowing or intentional. I would therefore hold that there is no reasonable likelihood that a properly-instructed jury would have reached a different verdict.

B

¶102 The majority's prejudice analysis "ha[s] the look and feel of presuming, rather than finding, prejudice." *Garcia*, 2017 UT 53, ¶ 38. In my view the court has not identified any persuasive grounds for concluding that Grunwald carried her burden of establishing that a jury required to find knowledge or intent would have been reasonably likely to enter a more favorable verdict.

¶103 The majority's contrary conclusion is due in no small part to its sometime reformulation of the prejudice analysis. As previously noted, the U.S. Supreme Court has said that the question in ineffective-assistance-of-counsel cases is whether there is a "reasonable probability" that "the result of the proceeding *would have been different*" absent counsel's errors. *Strickland*, 466 U.S. at 694 (emphasis added). This court has applied this test specifically to errors in jury instructions. *See Garcia*, 2017 UT 53, ¶¶ 28, 42 (stating that the court must "ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors" (quoting *Strickland*, 466 U.S. at 695–96)). In the face of this clear standard, the majority at times recasts

the prejudice inquiry as a "two-part analysis" in which the court must first "identify the theoretical factual scenarios in which the error in the jury instructions permitted the jury to wrongfully convict the defendant," and second "determine whether there is a reasonable probability that . . . the jury *convicted* the defendant based on one of those impermissible scenarios."[91] *Supra* ¶¶ 22–26 (emphasis added).

---

[91] The majority claims to find support for this "two-part analysis" in *State v. Garcia*, in which we said that the court of appeals had not presumed prejudice, but "analyzed how th[e] instruction might have impacted Garcia's trial and predicted juror behavior in response to the erroneous instruction." 2017 UT 53, ¶ 41, 424 P.3d 171. In *Garcia* we went on to say that the court of appeals had failed to "fully conduct[] the prejudice inquiry" because a finding of prejudice requires that the "failure to instruct the jury properly undermines confidence in the verdict,"—meaning that "the decision reached would reasonably likely have been different absent the errors." *Id.* ¶¶ 41–42 (internal citation and quotation marks omitted). But none of this "requires courts to compile a list of the theoretical factual scenarios in which the incorrect instruction permitted the jury to impermissibly convict the defendant," *supra* ¶ 23, or "determine whether there is a reasonable probability that . . . the jury convicted the defendant based on one of those impermissible scenarios," *supra* ¶ 26. The majority is breaking new ground here. And it is doing so in a manner that contradicts binding precedent from the United States Supreme Court.

The majority also tries to rehabilitate its new inverted two-step formulation by suggesting that it *effectively* "require[s] us to determine whether there is 'a reasonable probability that the jury would have reached a different verdict under a correct instruction.'" *Supra* ¶ 22 n.20. And the court does occasionally revert back to the actual *Strickland* test or include counterfactual language in its two-step approach. *See supra* ¶ 22 ("[W]e must ask ourselves two questions: (1) did the error in the jury instructions create the possibility that the jury convicted the defendant based on factual findings *that would not have led to conviction had the instructions been correct*? and, (2) if so, is there a *reasonable probability* that the jury based its verdict on those factual findings?" (first emphasis added)). But a two-step test is not a one-step test, and an inquiry into whether the jury actually based its verdict on an error in the instruction is not

(Continued)

¶104   This is a substantial reformulation.[92] The proper inquiry is a counterfactual one—one in which we ask whether the defendant has established a reasonable probability that the jury would have reached a different verdict under a correct instruction. This has been accurately described as "a relatively high hurdle to overcome." *Garcia*, 2017 UT 53, ¶ 44. The majority's inquiry, by contrast, asks only whether there is a reasonable probability that the jury *in fact* based its decision on an error in the jury instruction. *Supra* ¶ 27. This effectively switches the default answer. A jury may come to a verdict with an erroneous instruction in mind. But that does not necessarily tell us whether there is a reasonable probability that the jury would have come down the other way in the absence of such an error. And the majority opinion has thus substantially altered the governing standard for *Strickland* prejudice.

¶105   The majority's new inquiry asks whether a jury reasonably *could have* based its decision on the errors in the jury instruction. This is evidenced by the majority's repeated use of possibilistic rather than probabilistic language.[93] This is problematic, as both the U.S.

_____

the same thing as an inquiry into whether there is a reasonable probability that the jury would have rendered a different verdict in the absence of any error. If it were, there would be no need to reformulate the controlling test. The best that can be said of the majority's approach is that the reformulated two-step test sometimes comes close to the one-step test required by U.S. Supreme Court precedent. In my view that is insufficient.

[92] *See supra* ¶ 26 ("If we conclude there is a reasonable probability the jury convicted the defendant based on one of the identified, impermissible factual scenarios, we may confidently hold that there is a reasonable probability the jury would not have reached a guilty verdict but for the errors in the jury instructions.").

[93] *See supra* ¶ 36 ("[T]here is a reasonable probability the jury *may have* concluded that Ms. Grunwald did not understand Mr. Garcia's intentions . . . ." (emphasis added)); *supra* ¶ 40 ("[T]here is a reasonable probability that the jury *could have* found Ms. Grunwald's ability to understand Mr. Garcia's intentions at the time to be less than that of a reasonable person." (emphasis added)); *supra* ¶ 43 n.49 ("[W]e conclude that a jury *could* reasonably have found that Ms. Grunwald's failure to take affirmative steps to prevent a murder during the fifty seconds following Mr. Garcia's comment did not make her a knowing or intentional accomplice." (emphasis added)).

Supreme Court and this court have said that it is "not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Garcia*, 2017 UT 53, ¶ 42 (quoting *Strickland*, 466 U.S. at 693).

¶106   Using its new paradigm, the majority first faults the court of appeals for ignoring Grunwald's subjective mental state and resting its finding of no prejudice on the fact that "no reasonable person could have misinterpreted [Mr.] Garcia's objective" when he made his "buck" comment. *Supra* ¶ 35 (alteration in original). The court of appeals, the majority posits, should have considered the possibility that the jury could have believed that Grunwald's understanding of the situation fell below that of a reasonable person. *Supra* ¶ 38.

¶107   Fair enough. It is theoretically possible that the jury found that Grunwald "did not understand Mr. Garcia's intentions even though a reasonable person would have." *Supra* ¶ 36. But again, the majority's premise misstates the standard. The question is not what the jury in fact found. It is whether there is a reasonable probability that the jury would have reached a different verdict if it had been instructed correctly.[94]

¶108   The majority eventually makes the required leap, claiming that the inclusion of the element of recklessness in the jury instruction gives rise to a reasonable probability of a different outcome (at least in conjunction with other errors that I address below). *Supra* ¶ 46. But the court's standard seems to shift between the two formulations. And the totality of the evidence (including Grunwald's actions after the shooting) demonstrates that Grunwald's actions were knowing and intentional. *See supra* ¶¶ 93–96, 99–100. The majority's grounds for concluding otherwise—and

---

[94] *Garcia*, 2017 UT 53, ¶ 42, ("A proper [*Strickland*] analysis also needs to focus on the evidence before the jury and whether the jury could reasonably have [made factual findings] *such that* a failure to instruct the jury properly undermines confidence in the verdict." (emphasis added)); *see also Strickland v. Washington*, 466 U.S. 668, 693–694 (1984) ("It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding . . . . The defendant must show that there is a reasonable probability that . . . the result of the proceeding *would have been different*." (emphasis added)).

for painting Grunwald as a less-than-reasonable person—are unpersuasive.

¶109  The majority begins its case for Grunwald's reduced comprehension skills by highlighting the fact that she was only seventeen at the time of the crime. It also claims that Grunwald suffers from a "learning disability" which "may have lessened her ability to understand the significance of Mr. Garcia's words." *Supra* ¶ 39. But Grunwald was tried and convicted as an adult, and that decision is not challenged on this appeal. As for the alleged disability, it is only vaguely specified in the majority opinion. And Grunwald herself never made anything of this disability in her briefing on this appeal. Understandably so. A closer look at the record reveals that Grunwald's learning disability is a *reading disability*. And surely her reading disability had no bearing on her ability to understand Garcia's statements, which were delivered orally—face-to-face—not in writing.

¶110  For this reason there is no basis for the court's assertion that Grunwald's reading disability in any way "lessened her ability to understand the significance of Mr. Garcia's words." *Supra* ¶ 39. The majority falls short in its attempt to connect the dots on this point.[95] And a further exploration of the record would seem to undermine the majority's move and confirm appellate counsel's decision to not advance this argument. Grunwald may have had a reading disability, but she was also an honor roll student, completed a Certified Nursing Assistant program, and was offered a scholarship for an Emergency Medical Technician program.

¶111  Despite this, the majority concludes that Grunwald's age and learning disability, along with the fact that she "is easily intimidated, and was under a lot of stress at the time," create "a reasonable probability that the jury *could have* found Ms. Grunwald's ability to understand Mr. Garcia's intentions at the time to be less than that of a reasonable person." *Supra* ¶¶ 39–40 (emphasis added).

---

[95] The majority cites evidence showing that Grunwald struggles with "reading and writing," has trouble "comprehending" things she reads, and had to spend "almost three times the time that a normal student did to be able to understand" book projects. *See supra* ¶ 39 n.45. But none of this demonstrates that Grunwald has an auditory processing problem or that her struggles with "language comprehension" extend to understanding spoken English.

Again, the court's use of "could have" here is significant. *See Garcia*, 2017 UT 53, ¶ 38 (noting that even when a court never "explicitly state[s]" that it is "presum[ing] prejudice," it might still be employing an analysis that has "the look and feel of presuming, rather than finding, prejudice"). It is not enough to say that there is a reasonable probability that this evidence *could have* caused the jury to believe Grunwald was only reckless. The question is whether there is a reasonable probability that the proper instruction *would have* resulted in a different verdict. *Strickland*, 466 U.S. at 694 ("The defendant must show that there is a reasonable probability that . . . the result of the proceeding *would have* been different." (emphasis added)).[96]

¶112 Even if we place stock in the fact that Grunwald was seventeen, had a reading disability, was easily intimidated, and was under a lot of stress during the crime, we should recall the nature of Grunwald's claim. Grunwald didn't just claim she didn't know what Garcia meant by "buck him" in the head—she claimed she thought it meant that Garcia was only going to disable Wride's car. Are we supposed to believe she thought Garcia was going to buck Wride's car in the "head"? That is ridiculous. It would have made no sense for Grunwald to believe that Wride's car was the "him." And it is

---

[96] Citing one line of *State v. Garcia* out of context, the majority claims that "when used to discuss reasonable probabilities, 'could' and 'would' are synonymous." *Supra* ¶ 40, n.46. Of course they *can* be. But *Garcia* never suggested it was enough that there is a "reasonable probability that the jury *could* have" ruled a certain way, as the majority does here and elsewhere. *See surpa* ¶ 105 n.93. There is only one line in *Garcia* that uses the "could reasonably have" formulation. *See* 2017 UT 53, ¶ 42. And that line is followed immediately by the qualifier that "could reasonably have" means "*such that* a failure to instruct the jury properly undermines confidence in the verdict." *Id.* (emphasis added). Elsewhere, the *Garcia* opinion equated that lack of confidence in the verdict with a reasonable probability that "the result of the proceeding *would have been different*" *Id.* (emphasis added) (quoting *Strickland*, 466 U.S. at 694)). So *Garcia* does not change the standard of *Strickland* prejudice—nor could it, given that we are bound to follow *Strickland*. It is today's opinion that shifts the standard, in confusingly and systematically substituting "could have" for "would have" when discussing reasonable probability.

more than a little awkward to say you are going to disable another's car "in the head." There is simply no reasonable probability that the jury deemed Grunwald incapable of understanding Garcia's statement.[97] The only reasonable probability I see is that a jury (whatever its instructions) would be offended by Grunwald's insistence that she thought a threat by a violent person with a homicide record—who was readying a gun to fire toward a police officer and had just stated that he wasn't going back to prison—was simply a threat to *disable a police vehicle*. Because no reasonable jury would have found that Grunwald's comprehension was below that of an average person, I cannot accept the majority's conclusion that it is reasonably probable that removing the "recklessness" component from the jury instruction would have changed the jury's verdict.

¶113 The majority also claims that a "critical factual dispute" regarding the timeline of the murder helps create a reasonable probability that the jury would not have convicted Grunwald absent the erroneous jury instruction. *Supra* ¶¶ 41, 46. Initially, Grunwald testified that Garcia said he was going to "buck" Wride in the head *after* she placed her foot on the brake. Yet on cross-examination, Grunwald said that Garcia made this comment *before* she placed her foot on the brake.[98] The majority claims that if the jury accepted Grunwald's initial story, it is more likely that it believed that Grunwald acted without the knowledge or intent to kill Wride (and

_____

[97] As I noted above, it is "theoretically possible" that the jury could have found Grunwald's understanding to be subpar. *Supra* ¶ 107. So in concluding that no reasonable jury would have done so, I am not "reject[ing]" that theoretical "possibility," as the majority suggests. *Supra* ¶ 38 n.43. I am engaging in standard prejudice analysis—determining what the jury likely would have done with a different jury instruction.

[98] "Q. [W]as it before or after the car was shifted into gear that he said he was going to buck him? A. It was before. Q. It was before? A. Yes. Q. So by the time the car has shifted into gear, you know what he's going to do? A. I didn't know at the time. Q. I thought you just said he told you he was going to buck him. A. I didn't know what bucking means until after. Q. Well, didn't you testify that the specific words were he was going to buck him in the fucking head? A. Yes. Q. You didn't know what that meant? A. No. Q. He had just shown you the gun and everything and threatened you, purportedly? A. Yes."

presumably that the jury would not have convicted absent the erroneous jury instruction). *Supra* ¶ 43. I see two crucial problems with this argument. One is that it assumes that it is likely that a reasonable jury would have believed the timing Grunwald gave on direct examination. I see no basis for that conclusion. If anything, I see every reason to think that a reasonable jury would discount anything and everything in Grunwald's testimony that went in her favor. Once Grunwald made the ridiculous assertion that she thought a threat by Garcia to "buck him" in the "head" meant *disable Wride's vehicle*, a reasonable jury would have discounted anything else she said to try to exonerate herself. There is no reasonable likelihood that the jury credited Grunwald's first statement of the timing of events over the less favorable statement she made on cross-examination, let alone that an instruction eliminating "recklessness" would have caused the jury to alter its verdict.

¶114   I also see a problem with the majority's analysis even assuming that a reasonable jury would have accepted the timing of events more favorable to Grunwald. Assume that Garcia made his comment after Grunwald put her foot on the brake. Once he did make his intentions clear, wouldn't she have still been playing lookout, holding the truck steady, and waiting to act as a getaway driver? The disagreement in timing does not change the fact that Grunwald continued to help Garcia knowing that Garcia intended to "buck" Wride in the head.

¶115   The only way the majority's argument makes any sense is if one also assumes that Garcia made his comment "immediately before he commenced shooting." *Supra* ¶ 43. But no one argued that this was the case. Under the State's evidence, there were four and a half minutes between the time Grunwald's truck shifted into gear and the moment Garcia opened fire. *Supra* ¶ 10 n.1. Even under the version of events more favorable to Grunwald, Garcia made his "buck" comment three minutes and forty seconds after she placed her foot on the brake—*fifty seconds* before he opened fire. *Supra* ¶ 10 n.1. There is no reason to think that the jury believed Grunwald didn't have "time to process or otherwise react to the comment."[99] *Supra* ¶ 43.

---

[99] The majority responds to this pushback by suggesting that I am saying that Grunwald could and should have taken "affirmative steps to prevent a murder during the fifty seconds following Mr. Garcia's comment" in order to escape accomplice liability. *Supra* ¶ 43

(Continued)

¶116   The majority claims that the jury instruction's inclusion of recklessness is especially likely to have prejudiced Grunwald given that her trial counsel "expressly argued that she did not have an intentional or knowing mental state, but failed to cast doubt on the possibility of her having had a reckless mental state." *Supra* ¶ 45. But this is incorrect. Grunwald's counsel *did* cast doubt on the conclusion that Grunwald acted recklessly. In closing argument, Grunwald's attorney argued: "I'm going to ask you to find her not guilty, based on compulsion, based on a lack of intent, based on lack of knowledge, *foresight*, call it what you want . . . . *Hindsight is such a wonderful prism to look through. It's 20/20 vision.*" (Emphasis added.) It seems clear that Grunwald's counsel was attacking each of the possible *mens rea* standards—disputing that Grunwald (1) acted intentionally, (2) acted with the requisite knowledge; or (3) acted while appreciating the possibility that Garcia could shoot Wride.

¶117   Grunwald also defended against "recklessness" when she claimed that she believed police cars have bulletproof glass and that Garcia was specifically aiming to disable the patrol car. In support of this argument, she testified that she did not understand what "buck" meant, that Garcia refused to clarify the term, and that even after Garcia fired, she still believed he had only disabled Wride's vehicle. It is difficult to see how Grunwald's counsel "failed to cast doubt on the possibility" that Grunwald was "at most, only aware that her conduct *could* result in Mr. Garcia committing the crime . . . ." *Supra* ¶ 45. Grunwald definitely tried to cast doubt on the argument that she was aware Garcia could kill Wride. It just wasn't plausible (let alone reasonable) doubt. And no reasonable jury would have accepted Grunwald's position on that score—whatever the jury instruction.

¶118   The majority explains how the jury *could have* come to a different conclusion had "recklessness" been removed from the instruction. But it doesn't demonstrate that it is reasonably probable that the jury *would have*. Given the overwhelming evidence that

---

n.49. This is a straw man. As I explain below, my point is that fifty seconds were more than enough time for Grunwald to choose to not aid Garcia—not that it was enough time for her to thwart Garcia. *See infra* ¶¶ 127–29. Failing to prevent a crime doesn't make you an accomplice any more than failing to actually help cause a crime saves you from being an accomplice. *See supra* ¶ 61 n.73 (explaining that an accomplice's actions need not be a but-for cause of the crime).

Grunwald acted intentionally and the scant evidence that she misunderstood Garcia, there is no reasonable probability that the jury would have acquitted Grunwald had it been given a correct jury instruction. I would therefore hold that counsel's failure to object to this first error did not prejudice Grunwald.

II

¶119 I also agree with the majority and court of appeals' conclusion that counsel was deficient in failing to object to the jury instruction to the extent it permitted a conviction if Grunwald "'intentionally, knowingly, or recklessly solicited, requested, commanded or intentionally aided [Garcia] *who*' committed the principal crime." *State v. Grunwald*, 2018 UT App 46 ¶ 37, 424 P.3d 990 (alteration in original). The use of the word *who* rather than the word *to* inappropriately authorized the jury to convict Grunwald by finding that she aided Garcia in any way—including in some way unconnected to the murder—so long as Garcia actually committed aggravated murder. *Supra* ¶ 48. This was error. A conviction based on aid unrelated to the underlying crime is at odds with the requirement in *State v. Briggs* that an accomplice act with "the intent to aid the principal actor in the offense." 2008 UT 75, ¶ 13, 197 P.3d 628. It goes without saying that an accomplice's mental state must extend to the commission of the underlying crime.

¶120 That said, I simply cannot believe that the jury would have acquitted Grunwald had the instruction more clearly eliminated the possibility of convicting her for aiding Garcia in the abstract. While theoretically possible, it is not reasonably probable that the jury convicted Grunwald for any reason except helping Garcia kill Wride, let alone that the jury would have acquitted Grunwald if the instruction had said *to*. The jury knew that Grunwald held the brake as—or maybe even after—Garcia announced he was going to "buck" Wride in the head. It knew that Grunwald kept the truck steady as Garcia fired five shots out the back. And it knew that she sped away as Garcia fired his final two shots. The context also matters. Grunwald was on trial for assisting Garcia in aggravated murder, not for helping Garcia disable a police vehicle or evade arrest.

¶121 Once again, the majority grasps at the alleged uncertainty regarding the timeline of Garcia's "buck" comment and how that could have impacted Grunwald's mental state. This, the majority says, means that we "cannot be certain that the jury found that Ms. Grunwald's act of putting her foot on the brake was intentionally done *to* aid Mr. Garcia in committing the murder." *Supra* ¶ 50. Of course we cannot be certain. But that doesn't mean that there is a

reasonable probability that the jury convicted Grunwald for helping Garcia do something besides murder Wride or that it would have acquitted her if properly instructed. Whether Grunwald put her foot on the brake before or after Garcia made his "buck" comment does not change the fact that she continued to hold the truck steady as Garcia made preparations to shoot Wride five times. And again I find it highly likely that a reasonable jury confronted with Grunwald's ridiculous interpretation of the "buck" comment would discount any other point that she made in her favor—especially a point on which she contradicted herself at trial. *See supra* ¶ 113. So I don't see any reasonable likelihood that a properly-instructed jury would have resolved the timing discrepancy in Grunwald's favor. It may be that it is "unclear from the record [when] Ms. Grunwald put her foot on the brake." *Supra* ¶ 51. But even if this uncertainty told us something about Grunwald's mental state (it doesn't, *see supra* ¶¶ 113–15), it does not follow that "there is a *reasonable probability* the jury would not have concluded that Ms. Grunwald's act . . . was done to intentionally aid Mr. Garcia *to* commit the murder." *Supra* ¶ 51 (emphases added). Again, the standard is not whether there is some uncertainty—it is whether there is enough uncertainty to create a reasonable probability of a different outcome.

¶122 The majority also claims that there is a reasonable probability the jury found Grunwald "intentionally held her foot on the brake" but only "as a lookout and getaway driver in order to aid Mr. Garcia in disabling the police officer's vehicle." *Supra* ¶ 52. But to get there, the jury would have had to believe one or more of the following: that Grunwald misunderstood Garcia's buck-in-the-head comment (because she has a reading disability, is easily intimidated, and was under a lot of stress); that Garcia made the comment "immediately before" firing; or that Grunwald thought Garcia was shooting only to disable Wride's vehicle. As previously discussed, these alternatives are extraordinarily unlikely—Garcia made his "buck" comment *vocally*, gun in hand, while parked in front of Wride's vehicle—*fifty seconds* before firing. He said he was going to "buck *him* in the fucking *head*." The argument that Grunwald didn't have time to process the comment or believed that Garcia was only going to shoot Wride's car under these circumstances is absurd. The jury instruction may have been erroneous, but I cannot agree that the jury believed that Grunwald only ever meant to help Garcia disable a police car, or that switching *to* for *who* gives rise to a reasonable probability that the jury would acquit her of being an accomplice to aggravated murder.

¶123 Similarly, the majority advances the theory that because Grunwald did not tell Wride about Garcia's gun, warrant, or true identity, perhaps the jury found that she "aided Mr. Garcia to avoid arrest, rather than to commit murder." *Supra* ¶ 53. But once again, the majority fails to explain how remote possibility rises to the level of reasonable probability. Just as there is no real chance that the jury believed that Grunwald only meant to disable Wride's vehicle and there is no reasonable probability that it would have acquitted her with the proper instruction, there is no likelihood that the jury believed that Grunwald was only trying to help Garcia evade arrest or a reasonable probability that, had the jury instruction been proper, the jury would have acquitted Grunwald.

¶124 I take my colleagues' point that "we cannot assume that the jury accepted every aspect of the State's version of events" simply because Grunwald was convicted. *Supra* ¶ 57. But the majority's efforts to get to reasonable probability are the flipside of the same coin—the court assumes that if the jury had had the correct instruction, it would have acquitted because it accepted every aspect of Grunwald's version of events.[100] The majority piles inference upon inference, attempting to cast doubt on the whole case by casting doubt on the (suspiciously many) individual pieces. This misses the forest for the trees.

---

[100] *See supra* ¶ 50 ("[I]f the jury believed that Mr. Garcia made his 'buck' comment immediately before he began shooting, all of [Ms. Grunwald's] conduct, which allegedly constituted intentional aid, would have occurred before Ms. Grunwald heard the comment."); *supra* ¶ 51 ("[T]he jury could have determined that Ms. Grunwald had placed her foot on the brake at Mr. Garcia's insistence, or for some other reason . . . ."); *supra* ¶ 52 ("[T]he jury could have concluded that Ms. Grunwald . . . acted as a lookout and getaway driver in order to aid Mr. Garcia in disabling the police officer's vehicle. The evidence on record supports this possibility. Ms. Grunwald testified that even after Mr. Garcia fired his gun, she did not believe he had killed Sergeant Wride. Instead, she testified that she thought he had tried to disable the police car."); *supra* ¶ 54 ("[T]he jury could have found that she intentionally aided Mr. Garcia in the abstract by complying with his demands even though she did not know the purpose behind the demands. Her trial testimony is entirely consistent with this theory . . . .").

¶125 The majority seeks to minimize the significance of Grunwald's actions by isolating them from their relevant context. It does so, for example, by noting that the acts of "putting a foot on a brake and looking out of a car window" "seem fairly innocuous" when viewed in the abstract. *Supra* ¶ 50 n.57. Fair enough. But we don't consider these acts in isolation. We view them in the context of the totality of the evidence in the record when assessing the question of prejudice. *State v. Garcia*, 2017 UT 53, ¶ 28, 424 P.3d 171 (relying on *Strickland v. Washington*, 466 U.S. 668, 695–96). And once we look at the totality of the evidence, it can no longer be said that Grunwald's acts "carry little persuasive weight." *Supra* ¶ 50 n.57.

¶126 The majority's contrary conclusion is again rooted in its hang-up over the timing of Garcia's threat to "buck" the officer in the head. But this is a red herring for all the reasons noted above. *See supra* ¶¶ 114–15. And the acts of placing her foot on the brake while putting the truck in drive and serving as a lookout are the crucial elements of Grunwald's *actus reus* of assisting Garcia in his murderous scheme. In context, it seems apparent that Garcia asked Grunwald to take these steps to ensure that he could kill Sergeant Wride without being seen by passing vehicles or caught by pursuing vehicles after the shooting. No reasonable jury would have concluded otherwise or thought that Grunwald's acts of placing her foot on the brake and serving as a lookout were innocuous (or just reckless, or in furtherance of something other than murder).

¶127 The majority also finds it "potentially problematic to hold Ms. Grunwald criminally liable for aggravated murder for the continued act of holding her foot on the brake." *Supra* ¶ 51 n.58. And it questions whether there is anything else she "could have done once Mr. Garcia announced his intentions." *Supra* ¶ 51 n.58. The obvious answer to this question is that Grunwald could have decided not to commit the *actus reus* that sustained the charge and conviction of accomplice liability. She could have stopped playing lookout for Garcia and placed the truck's transmission back into park. The majority dismisses Grunwald's alternatives as options that "would not necessarily have prevented Mr. Garcia from shooting Sergeant Wride." *Supra* ¶ 51 n.58. But the question is not whether Grunwald's acts were a but-for cause of Garcia's murder. *See supra* ¶ 61 n.73. It is whether Grunwald committed the acts of an accomplice—whether she intentionally aided Garcia in his principal crime. And I see no basis for a conclusion that Grunwald's acts fell short of that standard. The whole point of having Grunwald put her foot on the brake was to give Garcia a quick getaway. And her

lookout function was a crucial aspect of the murderous scheme. These acts surely aided Garcia's murderous acts.

¶128 Ultimately, the majority is really quarreling over the sufficiency of the *actus reus* for which Grunwald was charged and convicted. But Grunwald has not challenged her conviction on that ground. And we are in no position to undermine the verdict on that basis.[101]

¶129 It undermines the very concept of accomplice liability to suggest that Grunwald would have been guiltless even if she had fully appreciated Garcia's "buck" comments because Garcia could have killed Wride anyway. This is beside the point under our law,

---

[101] Grunwald's acts are clearly sufficient to sustain her conviction. *See American Fork City v. Rothe*, 2000 UT App 277, ¶ 9, 12 P.3d 108 (affirming the conviction of an accomplice who looked up and down the aisles as the principal stole merchandise and exited the store with the principal). And it is no answer to note that "we do not know what *actus reus* the jury based its conviction upon." *Supra* ¶ 57 n.68. We do not need to know what specific "*actus reus* the jury based its conviction upon" to decide whether there is a reasonable probability that the jury would have acquitted Grunwald if properly instructed. A correct jury instruction, moreover, would not have yielded that information. Only a special verdict form would have told us the specific act the jury based its verdict on.

The majority complains that the error in the jury instruction "allowed the jury to convict [Grunwald] for an act unrelated to the murder," or for acts aimed at "assist[ing] Mr. Garcia for a non-criminal purpose." *Supra* ¶ 57 n.68. I concede the existence of this error (though it is worth nothing that the alternative possibilities the majority proffers—helping Garcia disable a police car or evade arrest—are hardly "non-criminal purposes"). But my analysis does not baldly "assume[] as true the very thing the jury instruction error prevents us from knowing." *Supra* ¶ 57 n.68. Again, it is not the jury instruction that deprives us of this information. It is the lack of a special verdict form, which is not an error. And my analysis is just standard prejudice analysis—a counterfactual assessment of what is reasonably likely to have happened had the jury been properly instructed. My conclusion is not a bare assumption. It is a careful analysis in light of all the evidence in the record—evidence that makes it exceedingly unlikely that a properly-instructed jury would have entered a verdict of acquittal.

which has never allowed an accomplice to avoid liability by showing that the principal would have committed the crime anyway (even absent her acts of aiding). *See supra* ¶ 61 n.73 (conceding there is no but-for cause element in the law of accomplice liability). The question is whether Grunwald intentionally aided Garcia with the intent that Wride be murdered, not whether Garcia needed, used, or wanted her help. And for all the reasons identified above, I see every reason to conclude that there is no reasonable probability that a properly-instructed jury would have reached a different verdict on this question.

### III

¶130 The court of appeals identified a third basis for a determination of ineffective assistance of counsel. Citing *State v. Jeffs*, 2010 UT 49, 243 P.3d 1250, the court of appeals said that the jury instruction should have required proof that Grunwald "intended or knew that *her* conduct . . . would result in the commission of the principal crime." *State v. Grunwald*, 2018 UT App 46, ¶¶ 29–30, 36, 424 P.3d 990 (emphasis added). There is clear dicta in our *Jeffs* opinion to this effect. *See* 2010 UT 49, ¶ 45 (stating that an accomplice to a principal crime with a "knowing" *mens rea* requirement must "know[] that his conduct will most likely cause" the principal offense). And the instruction at issue did not include this element.

¶131 The majority rightly repudiates this aspect of the *Jeffs* opinion. It holds that *Jeffs* "should not be read to require that an accomplice's conduct be a but-for cause of the underlying crime for liability to incur." *Supra* ¶ 61 n.73. Because the governing statute does not include this element, the majority holds that *Jeffs* should be read "to require only that the accomplice knowingly committed his or her own *actus reus* in order to help the underlying crime be committed." *Supra* ¶ 61 n.73. So despite contrary dicta in *Jeffs*, the majority holds that there is no requirement of proof that an accomplice knew that her acts themselves would *cause* or result in the principal crime. It is enough to "show that the defendant knowingly or intentionally committed the *actus reus* to help the principal actor in committing the crime." *Supra* ¶ 61 n.73.

¶132 I endorse this reformulation of the dicta in our *Jeffs* opinion. That dicta is incompatible with the governing statute and is properly revised by the court.

¶133 This reformulation, in my view, defeats Grunwald's third allegation of ineffective assistance of counsel—the charge that trial counsel was deficient in not objecting to the jury instruction's failure to require proof that Grunwald knew that her actions were

reasonably certain to "result in" the principal crime. *Grunwald*, 2018 UT App 46, ¶ 36. This was not an error under the majority's reformulation of *Jeffs*. And for that reason it cannot be a basis for a claim of ineffective assistance of counsel.[102] I would reverse the court of appeals' conclusion to the contrary and affirm the conviction on that basis.

## IV

¶134   The relevant portions of the jury instructions in this case allowed the jury to convict Grunwald as an accomplice to aggravated murder if it found that she "[i]ntentionally, knowingly, or recklessly solicited, requested, commanded, encouraged, *or* intentionally aided [Garcia] who" committed the elements of the principal crime and it also found that she "[i]ntended that [Garcia] commit the [principal crime], or . . . [w]as aware that [Garcia's] conduct was reasonably certain to result in [Garcia] committing the [principal crime], or . . . [r]ecognized that her conduct could result in [Garcia] committing the [principal crime] but chose to act anyway . . . ." *State v. Grunwald*, 2018 UT App 46, ¶ 31, 424 P.3d 990 (internal quotation marks omitted) (emphasis in original).

¶135   The only errors contained in this instruction are those discussed in Parts I and II—those which allowed the jury to convict Grunwald based on a finding that she aided Garcia recklessly or in some way unconnected to Wride's murder. But those errors were not prejudicial. And the third alleged error was not an error at all because the instruction correctly applied our third-party liability statute.

¶136   When reviewing ineffective-assistance-of-counsel claims, we are not required to make all inferences in the defendant's favor or equate theoretical possibility with reasonable probability. Because there is no reasonable probability that the jury would have come to a

_____

[102] The majority only weakly suggests otherwise. It effectively concedes that the error discussed in Part II above (the jury instruction's failure to require proof that Grunwald's actions were "done 'to' assist someone in committing murder") is the real problem. *See supra* ¶ 62 n.75. And it acknowledges that "the failure to reference Ms. Grunwald's conduct in the knowing mental state portion of the instruction may have been harmless." *Supra* ¶ 62 n.75. But for reasons explained above, it is less than harmless. It is not an error in light of our reformulation of *Jeffs*.

Lee, A.C.J., dissenting

different outcome had the jury instruction been correct, Grunwald's counsel did not prejudice her by failing to object to errors in it. Her ineffective-assistance-of-counsel claim should fail, and her conviction should be upheld. I respectfully dissent.